Michael J. HARSTAD, Appellant,

v.

Ray WHITEMAN and Shelby
Thacker, Appellees.

and

Michael J. Harstad, Appellant,

v.

Verna Lowe, Appellee.

and

Michael J. Harstad, Appellant,

v.

Asbury College, A Kentucky Nonprofit
Corporation, Appellee.

Nos. 2009–CA–000190–MR, 2009–
CA–000194–MR, 2009–CA–
001045–MR.

Court of Appeals of Kentucky.

March 4, 2011.

John E. Reynolds, Nicholasville, KY, Cliff Harstad, Chicago, IL, Thomas K. Herren, Lexington, KY, for appellant.

Debra H. Dawahare, Leila G. O'Carra, Lexington, KY, for appellees.

Before ACREE, VANMETER, and WINE, Judges.

## OPINION

ACREE, Judge:

Appellant, Michael Harstad, brings three appeals from separate Jessamine Circuit Court judgments relating to termination of his employment with appellee Asbury College. The first and second appeals challenge summary judgments for appellees Ray Whiteman, Shelby Thacker, and Verna Lowe on Harstad's claims of defamation and tortious interference with contractual relations. In the third appeal, Harstad claims reversible trial errors resulted in the jury verdict for Asbury on his breach of contract claim. We have consolidated these cases for the convenience of the Court and, after careful review, we affirm in all cases.

### Facts and Procedure

Michael Harstad was a tenured professor of ancient languages at Asbury College. Asbury is a Christian college that imposes high moral and ethical standards on both its students and faculty to ensure fulfillment of its mission and excludes those who are unwilling to meet those standards and expectations established by the college. Asbury's faculty manual sets out in detail its expectations for the faculty.

In addition to Asbury's mission statement, purpose statement, and statement of faith, the manual describes various activities deemed inappropriate and inconsistent with the college's mission. Relevant to this case, the manual states that a faculty member may be terminated as a result of behavior constituting or causing the perception of a dating or amorous relationship with a student.

In December of 2003, Asbury undergraduate students Ben Logan and Coral Kraayveld approached appellee Shelby Thacker, head of the language department in which Harstad was a professor, to express their concerns about Harstad. Among other complaints, they first told Thacker that they were unable to gain needed access to their professor because a graduate student, Janet Reichmuth, had become his constant companion. According to Logan and Kraayveld, Harstad had empowered her to correct their work, to sit in on their classes, and to permit or

prohibit their access to the college's tutoring center.

After consulting Asbury's provost, appellee Ray Whiteman, Thacker wrote Harstad on January 5, 2004, seeking a meeting. Specifically stating that the correspondence was "not one of accusation[,]" Thacker was "alerting [Harstad] to the fact that your students' perception of events, given the seriousness of the complaints, must be addressed." Without identifying the students, Thacker's letter repeated their complaints, including "perhaps the most serious, the belief that your relationship with Miss Reichmuth has transcended the normal boundaries of a student-professor relationship." According to Thacker, "[t]he students spoke in great detail, provided numerous examples, and were quite convincing."

Thacker and Harstad met to discuss Harstad's behavior that was creating the perception of an inappropriate professor-student relationship. Harstad acknowledged a relationship with Reichmuth but denied that it was inappropriate, demanded that Thacker reveal his accusers, and threatened retribution against anyone who lied about him or his relationship with Reichmuth. Thacker refused to identify the students; Harstad refused to alter his behavior. The meeting ended.

During the course of 2004, more reports of Harstad's liaisons with Reichmuth reached his superiors and would be the basis of his eventual termination. Harstad ultimately admitted most of the reports, including: that he and Reichmuth shared a cell-phone plan with sequential phone numbers; that the couple took walks together three to four times each week; that he assisted her in the lease of a vehicle, taught her to drive it and occasionally drove it himself; that they spent three or four hours each week exercising together; that they often dined and shopped togeth-

er off campus; that they selected movies from a video rental store and watched them together; that they exchanged gifts; that they sent a joint congratulatory gift to a mutual friend who had completed her dissertation; and that he assisted Reichmuth with housework. Additionally, the record shows Harstad was observed entering Reichmuth's apartment late at night more than once; his vehicle was frequently seen parked there; and several times the couple was observed shopping or having breakfast, lunch or dinner together.

The record also shows that at least five people reported observing physical contact between Harstad and Reichmuth. Most gave their sworn testimony to that effect. Faculty members Bonnie Banker and students Rachel Barrett and Coral Kraayveld reported seeing Harstad and Reichmuth holding hands. Faculty member and appellee Verna Lowe reported seeing them holding hands and also reported seeing them together at a department store shopping for videos when Harstad, standing behind Reichmuth, appeared to place his chin on her shoulder. Student Cody Kerr reported seeing them kiss. While Harstad denies any physical contact with Reichmuth, he does not deny such reports were made.

On November 18, 2004, based on these reports, Whiteman wrote a letter to Harstad focusing on the fact that, despite being informed of the college's concerns, Harstad continued to be "quite open in spending a considerable amount of time with Janet in public and spending time in her apartment." He noted that "[s]ome faculty, students and staff persons have expressed concern about the nature of this relationship[, and students] are asking why you are being allowed to violate community life standards." Emphasizing the perception of an improper relationship created by Harstad's behavior, Whiteman remind-

ed Harstad that "the 'appearance' of incorrect behavior can be as critical as actual behavior in such situations." He concluded that Harstad was "very clearly giving the appearance of behavior which is contrary to community life expectations, particularly when you are still legally married to another person." [1]

Whiteman's letter went on to remind Harstad of the high expectations of personal behavior to be modeled by faculty. He stated, "I am saddened that you have chosen to disregard these expectations[, ]but the situation cannot continue. You will note that while I have indicated that you have broken community life expectations which can result in termination, I have not actually indicated that you are being terminated." Instead, Whiteman asked Harstad to meet with the language department head, Shelby Thacker.

On November 22, 2004, Harstad did meet with Thacker. Thacker's November 30, 2004 memorandum of the meeting indicates Harstad again denied an inappropriate relationship existed and refused to change his conduct to counteract the perception that one did exist. Again, Harstad demanded to know which students and faculty members were complaining, but Thacker declined to answer. Harstad asked Thacker to prepare an account of their meeting and provide it to him and to Whiteman before 4:00 p.m. that day. According to the meeting memorandum, when Thacker said he could not make that deadline, Harstad responded that "there would be problems for me [Thacker]."

At 4:00 p.m. that day, Whiteman received a letter via his office fax machine from Harstad's attorney. *Prior to his* meeting with Thacker, Harstad had contacted his brother's Chicago law firm and retained legal representation. The letter from that attorney demanded "the names of the persons claiming to have knowledge of the alleged improprieties so that we may contact them and ask some questions." Because the students involved feared retribution, and because Harstad had promised retribution, the college decided not to disclose the witnesses' identities. The letter further stated, "Should you decide to proceed however, you should expect that we will immediately seek the intervention of the Courts, and vigorously pursue all legal and equitable remedies available to Dr. Harstad against both Asbury College and all individuals involved."

Whiteman did not respond to the attorney. Instead, after receiving Thacker's November 30, 2004 memorandum outlining the meeting, he wrote again to Harstad. He urged Harstad to meet personally with him and Asbury's president, Paul Rader, either on December 9 or 10, 2004. Harstad declined to do so.

On December 30, 2004, Harstad filed the first of his legal actions, seeking an injunction in the Jessamine Circuit Court to prevent any adverse employment action by Asbury. Harstad also claimed intentional interference with his employment contract. The court declined to grant the injunction by an order entered on January 29, 2005.

On February 23, 2005, Whiteman contacted Harstad again and notified him that he was being terminated. Harstad believed the termination was improper and continued to deny the allegations against him.

In accordance with administrative protocol, Harstad appealed his termination to a faculty appeals committee on two grounds. He asserted first that the relationship between himself and Reichmuth was not inappropriate under Asbury's standards and, second, that the college had failed to pro-

---

1. Harstad was in the process of divorce.

vide him with adequate notice of his termination as required in the faculty handbook.

The faculty appeals committee was authorized to make a report and recommendations to Asbury's president, but only the president could make the final decision regarding termination. The committee's report was indecisive. Regarding the propriety of the relationship between Harstad and Reichmuth, the report stated only that "due to the accepted and encouraged practice of faculty mentoring, the amount of time that Dr. Harstad and Ms. Reichmuth spent together may or may not be a significant indication of a relationship that has progressed beyond that of teacher/student." Noting the high degree of certainty it sought, the committee stated that it "cannot decisively say that the circumstantial evidence presented to it irrefutably indicates a dating and/or romantic relationship." This indecision was not, however, a consequence of witness credibility determinations. The committee expressly stated "that its judgment on the above allegations should not be misconstrued as a negative reflection on the credibility of those from whom it received testimony."

Regarding Harstad's second ground, the committee was more decisive and concluded that, to the extent the college failed to give Harstad adequate notice of his termination, the failure was reasonable in light of the court action he initiated interrupting the college's normal procedures.

The committee's indecision notwithstanding and as noted above, the faculty handbook authorized Asbury's president to make the final determination regarding termination. By letter dated June 28, 2005, to the chairman of the faculty appeals committee and copied to Harstad, President Rader concluded that Harstad's "behavior perceived as indicating an inappropriate relationship is unacceptable"; he decided that the "decision to terminate will stand." As a result, Harstad continued to pursue his legal claims against Asbury and various members of its faculty; he then initiated the separate suit against Verna Lowe.

Harstad's first complaint alleged that Whiteman and Thacker defamed him and intentionally interfered with his employment contract by making false statements regarding his relationship with Reichmuth. The complaint further alleged that Asbury College breached his employment contract by terminating him. In his separate complaint against Lowe, Harstad alleged defamation and intentional interference with his employment contract.

While the procedural history of this case before the circuit court is somewhat complex, only a brief summary is necessary for purposes of this appeal. Harstad's claims of defamation and intentional interference with his employment contract against Whiteman, Thacker, and Lowe were dismissed by summary judgment. The breach of contract claim against Asbury was the only issue to proceed to trial. Asbury prevailed on this claim, the jury having found that the college did not terminate Harstad without cause under the terms of the faculty handbook. Harstad did not move for a new trial postverdict.

On appeal, Harstad argues that the circuit court improperly granted summary judgment as to his defamation and intentional interference claims. With regard to the trial, Harstad argues that the circuit court improperly excluded evidence that other faculty members were treated differently under similar circumstances, and that additional jury instructions should have been provided.

### Summary Judgment Issues

The circuit court's decision to grant summary judgment is reviewed *de novo*. *Lewis v. B & R Corp.*, 56 S.W.3d 432, 436

(Ky.App.2001). "The standard of review on appeal of a summary judgment is whether the trial court correctly found that there were no genuine issues as to any material fact and that the moving party was entitled to judgment as a matter of law." *Scifres v. Kraft,* 916 S.W.2d 779, 781 (Ky.App.1996). "The record must be viewed in a light most favorable to the party opposing the motion for summary judgment and all doubts are to be resolved in his favor." *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.,* 807 S.W.2d 476, 480 (Ky. 1991). "The party opposing a properly presented summary judgment motion cannot defeat it without presenting at least some affirmative evidence showing the existence of a genuine issue of material fact for trial." *City of Florence, Kentucky v. Chipman,* 38 S.W.3d 387, 390 (Ky.2001). With this standard as our guide, we review the summary judgments entered prior to trial.

### The Defamation Claims

■ The essential elements of defamation are: "(a) a false and defamatory statement concerning another; (b) an unprivileged publication to a third party; (c) fault amounting at least to negligence on the part of the publisher; and (d) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication." Restatement (Second) of Torts § 558 (1977). When the communication concerns untrue allegations of criminal behavior or unfitness to perform a job, the communication is libelous per se or slanderous per se, and proof of context indicating malice is not required. "Although the law presumes malice where publications are slanderous per se, yet where the publication is made

under circumstance disclosing qualified privileges, it is relieved of that presumption and the burden is on the plaintiff to prove actual malice." *Weinstein v. Rhorer,* 240 Ky. 679, 42 S.W.2d 892, 895 (1931); *see also Columbia Sussex Corp., Inc. v. Hay,* 627 S.W.2d 270, 273 (Ky.App.1981) (setting out elements of defamation).

■ Harstad identifies as defamatory language a total of eleven (11) statements.[2] These statements fairly fall into four categories and, by representative example taken from his complaints, they are that Harstad: (1) "was seen involved in physical touching with a female student, both on and off campus"; (2) "was giving the appearance of behavior which is contrary to community life expectations"; (3) "was terminated ... for one or more of the reasons" related to behavior that created such an appearance; and (4) "was having an affair with a female student[.]" For purposes of review, we presume each of the eleven specific statements was expressed by the defendants to whom Harstad attributes them.

The basis of the circuit court's summary judgment was that all the allegedly defamatory statements were subject to a qualified privilege. Citing *Landrum v. Braun,* 978 S.W.2d 756 (Ky.App.1998), the circuit court determined that the "statements that Harstad alleges are defamatory were made within the context of the employment relationship and are qualifiedly privileged." We agree.

■ "The determination of the existence of privilege is a matter of law."

---

**2.** According to the two complaints in the respective lawsuits, nine (9) of these statements were uttered by Whiteman, Thacker or unknown defendants and two (2) were uttered by Verna Lowe. All of the statements were made by Asbury employees in the course of investigating complaints from students and others about Harstad and his role as an Asbury professor.

*Columbia Sussex,* 627 S.W.2d at 276.[3] Once a privilege has been placed in issue, "it thereupon falls upon plaintiff to defeat this defense by a showing that either there was no privilege under the circumstances or that it had been abused." *Id.* If the plaintiff fails to adduce such evidence sufficient to create a genuine issue of fact, qualified privilege remains purely a question of law under the summary judgment standard. *Cargill v. Greater Salem Baptist Church,* 215 S.W.3d 63, 68 (Ky.App. 2006) ("Although the jury normally determines whether a privilege was abused, a motion for summary judgment is appropriate when the record shows no facts which would lead to the conclusion that the Appellees acted with malice."). The circuit court's summary judgment in this case recognizes these concepts and this analytical procedure.

In two separate judgments, both entered on January 9, 2009, and in the absence of any contrary contention by Harstad, the circuit court found no factual dispute.

> Lowe's statements were made at the Provost's request for the purpose of enabling the Provost, the President, and the Faculty Appeals Committee to evaluate Harstad's professional performance and the decision to terminate Harstad's employment.... The statements at issue [in the separate suit against Asbury, Whiteman, and Thacker] were made between Asbury College's Provost at the time, Ray Whiteman, Plaintiff's department chair and immediate supervisor, Shelby Thacker, and the Faculty Appeals Committee, for the purposes of

evaluating Plaintiff's professional performance and evaluating the decision to terminate Plaintiff's employment.

(Order and Judgment, January 9, 2009). Based on these undisputed facts, the circuit court properly concluded as a matter of law that "the statements that Harstad alleges are defamatory were made within the context of the employment relationship and are qualifiedly privileged."

Citing *Frentz v. SHPS, Inc.,* 2006 WL 3457210 (Ky.App.2006) (2005–CA–001744),[4] the circuit court next correctly concluded that Harstad had a burden to carry to avoid summary judgment—presenting evidence sufficient to create a genuine issue that the privilege had been abused or waived by actual malice. *Cargill,* 215 S.W.3d at 68. The circuit court clearly demonstrated its focus on this issue in the hearing on the motions for summary judgment. There, the circuit court asked Harstad's counsel, "What is it that's in the record at this point that would carry the plaintiff's burden in showing that these individuals knowingly made false statements about him and that they did so with actual malice?" Neither counsel's verbal response nor his written memorandum persuaded the circuit court that the record contained evidence to create a genuine issue of material fact sufficient to require presentation to a jury. We agree with the circuit court.

■ Abuse of the privilege occurs in a number of situations:

---

3. We are aware of the nonfinal Kentucky Supreme Court opinion, *Calor v. Ashland Hosp. Corp.,* — S.W.3d —, 2010 WL 3374251 (Ky.2010), clarifying that *Landrum v. Braun* should not "have indicated that all questions related to the qualified privileges are matters of law and therefore decidable only by a court." *Id.* at — fn. 3. However, *Calor* reaffirms the holdings in *Columbia Sussex* and *Cargill v. Greater Salem Baptist Church,* 215 S.W.3d 63 (Ky.App.2006), upon which our analysis relies.

4. We cite *Frentz* here only because the circuit court did so and not in reliance on Kentucky Rules of Civil Procedure (CR) 76.28(4)(c).

The privilege may be abused and its protection lost by [1] the publisher's knowledge or reckless disregard as to the falsity of the defamatory matter; [2] by the publication of the defamatory matter for some improper purpose; [3] by excessive publication; or [4] by the publication of defamatory matter not reasonably believed to be necessary to accomplish the purpose for which the occasion is privileged.

Restatement (Second) of Torts § 596 cmt. a (1977) (citing §§ 600–605A). We agree with the circuit court that Harstad failed to present evidence sufficient to create a genuine issue of material fact that any of these circumstances existed.

Before this Court, Harstad first argues the privilege should not apply because the communications were not uttered in the usual and ordinary course of Asbury's business. This argument, it could be argued, falls under the second or fourth situations described in the Restatement. However, Harstad created no genuine issue of material fact regarding the abuse of the privilege.

Although Harstad's response to the motions for summary judgment included his own and Reichmuth's affidavits, nothing in those affidavits placed any evidentiary fact of the appellees' abuse of the privilege in issue. On the contrary, Harstad's exhibits presented to the court reveal a faculty that relied on reports from students, faculty, and staff who shared a duty to report perceived violations of Asbury's faculty manual. The record reflects that the actions of the defendants were within the spirit and letter of the faculty manual, the only exception having been occasioned by Harstad's prior resort to a legal remedy.

Harstad argues, however, that "the individual defendants were part of a 'subculture' at Asbury that acted on its own to preserve and protect that 'subculture' as opposed to necessarily the interests of Asbury itself." He also asserts that "his termination was accomplished through lying, dishonesty, gossip, rumor and slander" which he referred to as the "stock in trade for the Byzantine[-] like political culture and machinations that take place at Asbury." However, such conclusions and conjectures are not sufficient to sustain his burden created by the motions for summary judgment. His argument fails because "[c]onclusory allegations based on suspicion and conjecture" are not sufficient to create an issue of fact as to abuse of the privilege. *Cargill*, 215 S.W.3d at 69.

Harstad's second argument falls under the first situation recognized by the Restatement. If, before the circuit court, Harstad created a genuine issue of material fact as to whether appellees uttered the defamatory statements either knowing they were false or in reckless disregard for their truth or falsity, then summary judgment would not have been proper; there would have been a jury question as to whether the qualified privilege was abused and its protections lost.

Supporting his contention, Harstad points first to inconsistencies and anachronisms in communications among the defendants and non-defendant witnesses who provided information during the investigation. These inaccuracies show, so goes the argument, that the statements were lies; one can then infer such lies were uttered with malice. There are fatal flaws in this argument.

Closer examination of the alleged inconsistencies shows they are of slight degree and little, if any, legal consequence. It is unreasonable to infer from these inconsistencies alone that they were intentional or reckless misstatements.

For example, Harstad argues that Whiteman lied when he said Lowe report-

ed seeing actual physical contact between Harstad and Reichmuth during the Wal–Mart incident which he characterized as "nuzzling." In her deposition, Lowe testified only to witnessing Harstad closely behind Reichmuth, looking over her shoulder, without using the word "nuzzle," but nonetheless in a manner that made Lowe suspect an inappropriate teacher-student relationship.

Similarly, Harstad alleges Whiteman and Thacker made reference to his relationship with Reichmuth prior to actually receiving complaints from two particular students. He asserts that such references, having preceded the students' and others' complaints, were necessarily lies fabricated by Whiteman and Thacker. This inconsistent timeline, says Harstad, is proof of lying and malice. However, he does not contend that these complaints were never made. In fact, there is ample evidence in the record that they were made, and by more people than the two students to whom Harstad refers. Indeed, several individuals stated in deposition that they reported witnessing Reichmuth and Harstad spending a great deal of time together, holding hands, and even kissing.

Harstad's denials of any physical contact with Reichmuth may create an issue of fact as to whether he actually held her hand in public, but that fact is not material to the issue of malice here. The issue in Harstad's case against Asbury, Whiteman, and Thacker is *whether* such reports *were made;* there is no genuine issue as to that material fact—such reports were made and to the proper authorities.

Lowe's statements about Harstad's hand-holding, in fact, may be untrue. However, their falsity alone will not demonstrate abuse of the privilege that attached when those statements were elicited from her by Asbury personnel. It was Harstad's burden to present some evidence that would incline a reasonable person to believe that Lowe's perception was not simply the product of mistaken observation, but the result of malice, i.e., some evidence that Lowe knew she was lying or making wholly unfounded statements without regard to their truth or falsity. He presented no such evidence and, in deposition, even stated he had no idea why Lowe, Whiteman, or Thacker would be motivated to lie.

Even were we to conclude that each of these inconsistencies was both material and indicative of a specific falsehood, we could not reasonably conclude from their falsity alone that they were *malicious* utterances as opposed to mistaken observations. In other words, not every erroneous statement is expressed with malice. As our highest court plainly stated, once a qualified privilege attaches, even "false and defamatory statements will not give rise to a cause of action *unless maliciously uttered.*" *Stewart v. Williams,* 309 Ky. 706, 708, 218 S.W.2d 948, 950 (1949) (emphasis supplied).

Harstad was required to do more than assert that these statements were false; people are sometimes wrong without even suspecting it. It was therefore incumbent upon Harstad to present some evidence that the respective defendants uttered one or more of the statements Harstad found objectionable with

> knowledge that [the statement] was false or with reckless disregard of whether [the statement] was false or not.... [R]eckless disregard is ... a high degree of awareness of ... probable falsity, and ... [w]here the publisher must have entertained serious doubts as to the truth of his publication.

*Ball v. E.W. Scripps Co.,* 801 S.W.2d 684, 689 (Ky.1990) (citations and quotations omitted). He failed to do that.

This case provides a practical illustration of how the privilege works and also its purpose in facilitating open, good faith communication between one person who "has an interest, or in respect to which he has a duty, public, personal, or private, either legal, judicial, political, moral, or social, [and another] person having a corresponding interest or duty." *Tucker v. Kilgore*, 388 S.W.2d 112, 114–15 (Ky.1965) (quoting 53 C.J.S. *Libel and Slander* § 89, pp. 143–44 (2010)). In this case, witnesses, sometimes upon inquiry as with Lowe, told Asbury authorities what they perceived. These perceptions were not without foundation. Harstad never denied his close relationship and physical proximity to Reichmuth on the occasions in question; he thereby contributed to the circumstances perceived by witnesses and determined by Asbury administrators as improper conduct under the school's employment standards.

In a final argument, Harstad urges us to reject the qualified privilege analysis in favor of the intra-corporate immunity analysis in *Biber v. Duplicator Sales & Service, Inc.*, 155 S.W.3d 732 (Ky.App. 2004). However, this case does not offer such a choice. Harstad confuses the qualified privilege applicable here and the absolute privilege of the intra-corporate immunity rule. The latter rule is premised on the legal fiction that there is no *publication* of statements when the communication is intra-corporate, i.e., between or among corporate agents or employees. *Biber*, 155 S.W.3d at 736. There is no such presumption with the qualified privilege which *Biber* itself distinguished from the intra-corporate immunity rule. *Id.* at 737 ("Kentucky has recognized only a qualified privilege and would reject the intra-corporate immunity rule."). *Biber* is inapplicable.

Because Harstad failed to adduce evidence sufficient to create a genuine issue that the qualified privilege was abused or waived, i.e., not "exercised *in a reasonable manner and for a proper purpose* [,]" *Stringer v. Wal–Mart Stores, Inc.*, 151 S.W.3d 781, 797 (Ky.2004), summary judgment was properly entered.

### The Tortious Interference Claims

■ The circuit court granted summary judgment on the claim of tortious interference because the claim requires interference and improper conduct by a third party. Because that element is absent here, we agree with the circuit court.

■ Agents of a party to a contract who act within the scope of their employment cannot interfere with that party's contract. *See Carmichael–Lynch–Nolan Advertising Agency, Inc. v. Bennett & Associates, Inc.*, 561 S.W.2d 99, 102 (Ky.App.1977) (adopting Restatement (Second) of Torts, § 766 (1939), requiring the tortfeasor to be a third party, not a party to the contract or such party's agent); *see also Leary v. Daeschner*, 186 F.Supp.2d 774, 777 (W.D.Ky.2001) ("no allegation of interference with a third-party contract or relationship"). It was undisputed that Whiteman, Thacker, and Lowe were employees of the college and acted as its agents; they were not third parties. The appellees' statements were made within the scope of investigating a faculty member's violation of the employer's rules and, therefore, are within the scope of their employment. Also, as previously discussed, Harstad failed to establish any evidence of malice or improper purpose, which is also a necessary element of the claim. *See NCAA By and Through Bellarmine College v. Hornung*, 754 S.W.2d 855, 859 (Ky.1988). Therefore, the circuit court's grant of summary judgment on the issue of tortious interference is affirmed.

### Trial Issues

█ Before addressing Harstad's claims of trial error, we turn first to the appellees' argument that Harstad "irrevocably waived any right to [a new trial] by declining to move the trial court for it." This is the current federal rule. *See Unitherm Food Systems, Inc. v. Swift–Eckrich, Inc.,* 546 U.S. 394, 404, 126 S.Ct. 980, 987, 163 L.Ed.2d 974 (2006) ("a party is not entitled to pursue a new trial on appeal unless that party makes an appropriate postverdict motion in the [trial] court"). It was also the rule in Kentucky under the old Civil Code governing practice prior to adoption of the current Kentucky Rules of Civil Procedure (CR). *Norfolk & W. Ry. Co. v. Blevins,* 310 Ky. 367, 369, 220 S.W.2d 825, 826 (1949) ("Our decisions are numerous in support of the rule that *any* error occurring during the trial must be incorporated in the motion for a new trial, otherwise this court cannot consider it.") (Citing Civil Code Practice §§ 340, 342; emphasis supplied). Under the old Civil Code, a party who objected only during trial or made only a preverdict motion failed to adequately preserve the issue for appellate review for "it was *also* his duty to bring the alleged error to the attention of the trial court in his motion and grounds for a new trial to the end that the court might have the opportunity to correct any error in this regard of which he was convinced." *Thompson's Adm'r v. First Nat. Bank,* 234 Ky. 252, 27 S.W.2d 978, 980 (1930) (emphasis supplied). A preverdict objection not brought to the trial court's attention in a postverdict motion for new

trial waived that objection. *Victory Cab Co. v. Watson,* 238 S.W.2d 1004, 1006 (Ky. 1951) ("At the trial appellant saved exception to the giving of instruction No. 2, but in his motion and grounds for a new trial he only assigns the giving of instructions 3, 4 and 6 as error. He thereby waived his exception to instruction No. 2.").

However, when Kentucky's high court adopted the current civil rules in 1953, it proposed a significant change from prior practice; the Court added a new rule, codified as CR 59.06, stating: "Allegations of error, otherwise properly preserved, in respect to rulings, orders or instructions of the court need not be presented in a motion for a new trial in order to be preserved for appellate review." CR 59.06. There is no corollary in the federal rules, but it binds us in Kentucky.

The original motivation prompting this deviation has been lost in time. However, having reflected upon it in the context of similar rules of our sister states,[5] we conclude that CR 59.06 is the superior rule for two primary reasons.

First, CR 59.06 eliminates the harshness of the federal rule while retaining, as an option for the litigant, the benefit of postverdict motions. Our rule eliminated the trap of mandating *every* preverdict error be re-presented to the trial court postverdict or be waived. At the same time, CR 59.06 *does not prohibit* a party from asking the trial judge to reconsider any adverse rulings by means of a postverdict motion. Doing so is often the better practice since it allows the trial court a second reflection under less pressing circum-

---

5. Rules of our sister states vary. For example, Texas does not require a motion for new trial prior to appellate review, but with several exceptions listed in the rule such as when the ground is that the verdict was against the weight of the evidence. TX Rules of Civil Procedure, Rule 324. Illinois requires the post-trial motion in cases tried before a jury,

but not cases tried before the court. *Compare,* ILCS S.Ct. Rule 366(b)(2)(iii), *with* ILCS S.Ct. Rule 366(b)(3)(ii). Other states appear to follow the federal rule. *See, e.g., Morin v. Brassington,* 871 A.2d 844, 851 (Pa.Super.2005) ("Generally speaking, failure to specify a ground for relief in a post-trial motion renders the issue waived on appeal.").

stances than were attendant to the issue when first raised. CR 59.06 merely leaves to the affected party the decision whether such a course is merited.

Second, CR 59.06 retains the purpose of the federal rule by continuing the requirement that the issue be preserved. That is the function of the qualifying language that any errors not presented to the trial court in a postverdict motion must have been "*otherwise properly preserved.*" CR 59.06 then does not mean that a party need never again make a postverdict motion preliminary to taking an appeal. We agree with our sister court that

> [c]ertain motions, such as challenges to verdicts on the ground that they are against the great weight of the evidence, must be raised in a motion for a new trial in order to preserve them for appeal. [Citations omitted]. The purpose behind this rule is clear: if these issues were not previously [to the appeal] raised in this manner, there would be no record regarding them to review on appeal. However, issues [such as] regarding the admission or exclusion of evidence are properly preserved by a timely objection on the record....
>
> ....
>
> A timely objection on the record, with a response by opposing counsel and a ruling by the trial judge, should create an adequate record from which to review the admission or exclusion of evidence. There is no additional requirement that a party restate his evidentiary objections anew in his motion for a new trial.

*Heshelman v. Lombardi,* 183 Mich.App. 72, 454 N.W.2d 603, 608 (1990).

Therefore, appellees' argument here would sway us, even in light of CR 59.06, if Harstad argued only that the verdict was not sustained by the evidence. But that is not his argument. He argues instead that the trial court erred by: (1) failing to properly instruct the jury; and (2) excluding evidence of disparate treatment. If these claims of error were "otherwise properly preserved," CR 59.06 makes his failure to file a motion for a new trial irrelevant.

Harstad preserved both errors and substantially complied with CR 76.12(4)(c)(v) [6] by referencing the record where such preservation may be found. Therefore, we shall consider Harstad's remaining arguments.

### Excluded Evidence of Disparate Treatment

 "[A]buse of discretion is the proper standard of review of a trial court's evidentiary rulings." *Goodyear Tire & Rubber Co. v. Thompson,* 11 S.W.3d 575, 577 (Ky.2000) (citations omitted). "The test for abuse of discretion is whether the trial [court's] decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Id.* at 581.

 We note first that Harstad did not assert a claim of disparate treatment in which similarly situated employees were treated differently on the basis of class protection. Therefore, we must consider whether the trial court was clearly erroneous in rejecting such evidence on the basis that it was irrelevant to the breach of contract claim. We conclude, as we have before in another employment contract breach case, that "[e]vidence relating to other contracts would have been irrelevant and confusing." *Humana, Inc. v. Fair-*

---

**6.** Technical compliance requires that the brief "shall contain *at the beginning of the argument* a statement with reference to the record showing *whether* the issue was properly preserved for review and, if so, *in what manner.*" CR 76.12(4)(c)(v) (emphases supplied).

*child*, 603 S.W.2d 918, 921 (Ky.App.1980). Therefore, we find no abuse of discretion.

In his brief, Harstad argues alternatively that evidence of disparate treatment "was material to the issue of good faith[.]" As appellees point out, Harstad did not make this argument to the trial court but presents it here for the first time. Harstad does not refute this in his reply brief. Consequently, we will not entertain this argument "for the simple reason that on this appeal [an] altogether different theor[y is] advanced for the first time why the lower court should have permitted this evidence to be introduced." *Lewis v. Commonwealth*, 318 S.W.2d 857, 859 (Ky. 1958).

### The Proposed Jury Instructions

■ "Alleged errors regarding jury instructions are considered questions of law that we examine under a *de novo* standard of review." *Hamilton v. CSX Transp., Inc.*, 208 S.W.3d 272, 275 (Ky.App.2006).

■ Kentucky follows the "bare bones" rule of jury instructions and gives latitude for attorneys to flesh out the details in their arguments. *Cox v. Cooper*, 510 S.W.2d 530, 535 (Ky.1974). The trial court instructed the jury to answer the following interrogatory:

> Do you believe from the evidence that Defendant Asbury College breached a contract with Plaintiff Michael Harstad by terminating his employment without adequate cause, for any of the reasons set forth in Asbury's Faculty Manual Sections 400.10.1B, 400.10.1C, or 400.10.1E?

The jury had a copy of the faculty manual, previously admitted into evidence, to reference during deliberations. Harstad claims two additional jury instructions and associated interrogatories, based on the manual, should have been provided.

■ First, Harstad wanted to set out in a jury instruction the portions of Asbury's faculty manual describing written termination procedures with an interrogatory asking whether Asbury complied with them. However, portions of the proposed instruction did not accurately reflect the faculty manual provisions; such portions thus would not have been proper. Other portions of the proposed instruction, such as the employment termination notice requirements, were accurately stated. While we agree with Harstad that they would not have been improper, he does not explain how their exclusion was erroneous.

Harstad argues that without his proposed instruction "the jury could only conclude that the process followed by Asbury was correct[.]" But that is not so. The instruction actually given allowed Harstad to argue to the jury, from evidence he presented, that Asbury deviated from its own procedures and therefore breached his employment agreement. The proposed instruction would only have given "undue prominence" to this argument contrary to Kentucky's "bare bones" approach. *Rogers v. Kasdan*, 612 S.W.2d 133, 136 (Ky. 1981).

Harstad's proposed instruction also states that the college owed him a duty of good faith. However, the issue of good faith is subsumed by the question of good cause which was submitted to the jury. That is, the jury could not have found good cause without also finding good faith on Asbury's part. Again, Harstad had the opportunity to argue absence of good faith to the jury based on such evidence he presented. The verdict demonstrates Harstad's inability to persuade the jury that his claim in that regard had merit.

■ The second proposed instruction would have set out Asbury's policy on lies, gossip, and slander. But as we noted previously, the policy manual was admitted

into evidence and available to jurors. Highlighting such evidence in an instruction, again, only would have given undue prominence to evidence.

The interrogatory proposed in conjunction with this instruction would have asked the jury whether Asbury used lies, gossip, and slander as a basis for terminating him. Again, such a question was subsumed in the interrogatory that was presented to the jury. If the jury believed Harstad's claim of termination on the basis of lies, gossip, and slander, the verdict would have been in his favor.

The sole issue in this case was whether Asbury breached its contract with Harstad by terminating him without adequate cause. The instruction in this case did that and satisfied the requirement that it "should provide only the *bare bones,* which can be fleshed out by counsel in their closing arguments if they so desire." *Bayless v. Boyer,* 180 S.W.3d 439, 450 (Ky. 2005) (quoting *Cox v. Cooper,* 510 S.W.2d 530, 535 (Ky.1974)). We find no error here.

Because we find no genuine issue of material fact regarding Harstad's claims of defamation and tortious interference with his contract, and because we find no reversible errors committed by the trial court, the judgments of the Jessamine Circuit Court are affirmed.

ALL CONCUR.