Lynora FORTNEY, Appellant

v.

Oralia GUZMAN; Dorothy Light; Brenda Kemp; Barbara Warman; and Catherine Pendleton, Appellees

NO. 2013–CA–000419–MR

Court of Appeals of Kentucky.

RENDERED: MAY 22, 2015; 10:00 A.M.

Discretionary Review Denied by Supreme Court March 9, 2016

Briefs for Appellant: Philip C. Kimball, Louisville, Kentucky

Brief for Appellees: Byron E. Leet, Deborah H. Patterson, J. Brooken Smith, Louisville, Kentucky

BEFORE: ACREE, CHIEF JUDGE; MAZE AND STUMBO, JUDGES.

## OPINION

ACREE, CHIEF JUDGE:

The dispositive issue before us is whether the Jefferson Circuit Court properly concluded that appellees Oralia Guzman, Dorothy Light, Brenda Kemp, Barbara Warman, and Catherine Pendleton were entitled to summary judgment as a matter of law on appellant Lynora Fortney's defamation claims. The circuit court found that the appellees' allegedly defamatory statements were protected by a qualified privilege, and that Fortney had failed to

produce sufficient evidence that the appellees abused or exceeded that privilege to survive summary judgment. We agree and affirm.

## I. *Facts and Procedure*

In June 2011, Barbara Warman, Coordinator of Internal Security for Jefferson County Public Schools (JCPS), received an anonymous tip that the day custodian at Slaughter Elementary School had illicitly appropriated metal shelving belonging to the school. Investigator Warman informed Slaughter's principal, Catherine Pendleton, of the allegation. Principal Pendleton questioned Fortney about the shelving because Fortney was the school's plant operator responsible for all JCPS property located at the school. Fortney claimed she told the day custodian that the shelves were "trash" and that together they put the "trashed items" behind the school.

Pendleton then met with Brenda Kemp, the school's cafeteria manager who admitted she had made the anonymous phone call. Kemp recounted her knowledge of the missing shelving and additionally informed Principal Pendleton that Fortney had given a surplus piano to one of the school's instructors, Oralia Guzman. Principal Pendleton advised Investigator Warman of the new allegation; Warman then expanded the scope of her investigation.

Warman spoke directly with Kemp and had her put the allegations in writing. Kemp said: "I heard Lynora Fortney told Oralia Guzman that she could have a piano from [the night custodian] and Dorothy Light."

Investigator Warman next spoke with Fortney. Fortney denied giving away school property. With respect to the piano, Fortney stated she "vaguely" recalled the principal telling her the piano was surplus, and thought she told the school custodians to move it. Fortney denied knowing the piano had in fact been moved, denied knowing the piano was outside the school, denied speaking with Guzman about the piano, and denied giving the piano to Guzman.

Investigator Warman asked Fortney to produce her surplus-property file; Fortney stated no such file existed. Fortney explained that, when disposing of surplus property, her practice was to fax a form to the JCPS surplus warehouse requesting that a warehouse employee pick up the surplus item. Fortney described the warehouse's method of accounting for its pickups as "non-existent." Fortney claimed she kept copies of all of the faxes that she sent to the surplus warehouse until sometime in 2009 when she disposed of her files.

Fortney regularly attended the yearly plant operator's training, and admitted she had recently received a new copy of both the Plant Operator's Handbook and JCPS Fixed Assets Guidelines. The Plant Operator's Handbook stated that "taking JCPS property is **never** allowed. Items cannot be kept even when found in the trash, found on the floor, labeled as 'surplus', etc." (R. at 147; emphasis in original). According to the Fixed Assets Guidelines, musical instruments with a purchase cost of at least $300 are fixed assets. The Fixed Assets Guidelines provided specific instructions for disposing of fixed assets, and strictly prohibited giving or throwing such property away:

*All Fixed Assets must be accounted for at all times*. If an asset is damaged, lost, transferred, stolen, or had just outlived its usefulness, it must be reported. *Absolutely NO item may be given away to a person, group, organization, church or company (Exception: Distribution of Surplus Technology Equipment—see re-*

*quirements). **NO** item may be thrown away.*

. . . .

If a fixed asset that is damaged beyond repair, is out of date, is being replaced, or has outlived its usefulness, call [Supply Services] to schedule a pick up. This includes items that you want to throw away, give away, or just get rid of. Complete the form "Surplus Pick–Up" to document what is removed from your location. All items must go to the JCPS auction (Surplus Warehouse).

(R. at 206, 208; emphasis in original).

Investigator Warman obtained and compared the school's 2006 inventory with its 2011 inventory, which revealed that one of the school's two pianos was missing. The 2011 inventory described the missing piano as a Baldwin, Hamilton model piano marked with JCPS property tag # 36063.

Investigator Warman spoke with both the day custodian and the night custodian. The day custodian admitted taking the shelving, but denied knowing anything about the piano. The night custodian remembered that Principal Pendleton wanted the piano on the stage disposed of, but did not know what happened to it. The night custodian stated neither he nor the day custodian removed the piano from the stage.

Investigator Warman next interviewed Dorothy Light, Slaughter's Family Resource Coordinator (FRC). Light stated she usually ate lunch with Fortney, but was not familiar with Fortney's job duties. Light denied knowing anything about a missing piano. After the interview, Light called Guzman and told her an investigator was asking about the piano Fortney gave her. Guzman contacted Investigator Warman and candidly admitted she was in possession of the piano. Investigator Warman dispatched JCPS employees to Instructor Guzman's residence to reclaim

the piano; the piano recovered matched the model and JCPS tag number of the missing piano listed on Slaughter's 2011 school inventory.

Investigator Warman interviewed Instructor Guzman. Guzman confirmed that, during the construction of a new media center at the school, Fortney gave her a surplus piano. Guzman stated Fortney first tried to give the piano to a construction worker, but the worker would not take it unless Fortney signed a document stating she was giving it to him; Fortney refused to do so. Guzman then said Fortney offered the piano to her. Guzman contacted her children, who helped her push the piano down the sidewalk to her home located behind the school. Guzman submitted a written statement to Investigator Warman, stating, in pertinent part:

> I[,] Oralia Guzman[,] state that the piano was given to me by [Fortney]. . . . [When] the construction worker did not take it[, it] was then said to me by [Fortney] that the piano was going to be disposed of and that if I wanted it I could have it since they were going to dispose of it, that to me was that they were going to trash the piano. After she had given the piano to me I rolled the piano down the side walk to my house, and never thought of it being any problem. If I knew then what I know now of the proper way that JCPS disposes of any type of furniture or inventory, I would never have taken the piano that was given to me.

(R. at 6).

Investigator Warman interviewed Light a second time, at which time Light admitted she directly heard Fortney give Instructor Guzman the piano. Light stated she was initially reluctant to talk to Investigator Warman because she was friends with both Fortney and Guzman, and did

not want to get them in trouble. Light stated she overheard three conversations relevant to the investigation. The first conversation involved Fortney and a construction worker. Light stated that the worker asked Fortney about the piano, which was situated outside the school; Fortney responded that the piano was garbage and asked the worker if he wanted it. The worker said yes, but that he would have to come back later with his truck to pick it up, and that he needed Fortney to write a note stating she was giving him the piano.

A short time later, Light overhead Guzman ask Fortney why the piano was outside. Fortney responded that the piano was garbage and was going to be thrown away; Fortney told Guzman she could have the piano. Light then heard Guzman call her children and ask them to come to the school to help her push the piano home. When her children arrived, Light watched as they pushed the piano toward Guzman's home. Later that afternoon, the worker returned with his truck. Light overhead Fortney tell the worker that she could not write him a note and that she had already given the piano away.

Light submitted a written statement to Investigator Warman, wherein she stated: "I overheard a conversation between [Fortney] and [Guzman]. [Guzman] asked why a piano was sitting outside and [Fortney] said it was being trashed. [Guzman] said it was a shame to trash it and [Fortney] told her if she wanted it to take it." (R. at 7).

At the conclusion of her investigation, Investigator Warman prepared a written report summarizing the relevant JCPS policies, her witness interviews, and their written statements. She concluded that "[t]he allegation that ... in the summer of 2009 [Fortney] inappropriately gave away surplus JCPS property from Slaughter

Elementary School is substantiated." Investigator Warman submitted her report to the Executive Director of Human Resources and provided a copy to Principal Pendleton. In light of Investigator Warman's finding, Principal Pendleton recommended that Fortney be discharged. Principal Pendleton submitted her written request to the JCPS Employee Relations Department. Therein, she cited Investigator Warman's substantiated allegation that Fortney "inappropriately gave away surplus JCPS property" as the reason for discharge. The JCPS superintendent ultimately accepted Pendleton's recommendation.

In November 2011, Fortney filed a lawsuit claiming libel against Guzman, Light, Kemp, Warman, and Pendleton. Following a year of discovery, the appellees filed a joint motion for summary judgment, alleging their statements were qualifiedly privileged and that Fortney had failed to produce sufficient evidence to overcome the privilege. The circuit court agreed, additionally finding a lack of publication. The court granted the motion for summary judgment and dismissed Fortney's libel action. This appeal followed.

## II. *Standard of Review*

"The standard of review on appeal of summary judgment is whether the trial court correctly found there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." *Carter v. Smith*, 366 S.W.3d 414, 419 (Ky.2012). When reviewing a summary judgment order, only legal questions and the existence, or non-existence, of material facts are considered. *Stathers v. Garrard County Bd. of Educ.*, 405 S.W.3d 473, 478 (Ky.App.2012). Our review is *de novo. Id.*

Before the circuit court, "[t]he moving party bears the initial burden of showing

that no genuine issue of material fact exists, and then the burden shifts to the party opposing summary judgment to present" evidence establishing a triable issue of material fact. *Lewis v. B & R Corp.*, 56 S.W.3d 432, 436 (Ky.App.2001). That is, "[t]he party opposing a properly presented summary judgment motion cannot defeat it without presenting at least some affirmative evidence showing the existence of a genuine issue of material fact for trial." *City of Florence, Kentucky v. Chipman*, 38 S.W.3d 387, 390 (Ky.2001).

### III. *Analysis*

We find that the judgment can be affirmed on the basis of the conditional, or qualified, privilege defense. Therefore, that is the focus of our analysis.

Fortney takes issue with the fact that "the Circuit Court began its analysis of defamation law with an homage to *Harstad v. Whiteman*, 338 S.W.3d 804 (Ky.App.2011) ... and completely ignored the leading case on the subject from our Supreme Court: *Stringer v. Wal–Mart Stores, Inc.*, 151 S.W.3d 781 (Ky.2004)." To assuage Fortney's concern that this Court might do the same, we were fully prepared to ignore *Harstad* in our analysis, cite *Stringer* as appropriate, and, doing so, still conclude that summary judgment was proper. However, during the pendency of this appeal, our Supreme Court issued its opinion in *Toler v. Sud–Chemie, Inc.*, 458 S.W.3d 276 (Ky.2014). The *Toler* Court declared *Harstad* to be "a thorough, accurate review of our case law and the proper analytical approach to qualified-privilege defamation cases." *Id.* at 285. Contrary to the contention of Fortney, *Harstad* seeks to right the ship not rock the boat. The circuit court's reliance on *Harstad* was by no means misplaced.

The lure of *Stringer* as authority for defamation law is mildly perplexing. It is not, as Fortney suggests, a watershed case in this area of the law. It establishes no new principle; it reverses no precedent and criticizes no case. Every point of law made in *Stringer* is based on existing law, some of ancient origin.

Unfortunately, *Stringer* is the case that prompted a leading authority on defamation to say that, when it comes to proof of "'malice' that will defeat a claim of conditional privilege[,]" Kentucky's "law is not entirely clear[.]" 1 Robert D. Sack,[1] *Sack on Defamation: Libel, Slander, and Related Problems* § 9:3.2, at 9–42, 9–44 (4th ed. 2012) (citing *Stringer*). *Stringer* also troubled the Sixth Circuit Court of Appeals which, referencing Judge Sack's analysis of *Stringer*, suggested that Kentucky is unique in its "*apparently singular approach* to defamation[.]" *Hodges v. Ford Motor Co.*, 272 Fed.Appx. 451, 456 (6th Cir.2008) (emphasis added). We believe *Stringer* has been misunderstood. *Toler* recognized this misunderstanding and, we believe, has laid that misunderstanding to rest.

Defamation claims, including claims of libel, require proof of: (1) a false and defamatory statement; (2) about the plaintiff; (3) which is negligently published; and (4) which causes injury to reputation. *Toler*, 458 S.W.3d at 282; *Harstad*, 338 S.W.3d at 810. Defamation by written words is libel. *Toler*, 458 S.W.3d at 281, n. 7 (slander is "simply oral defamation" while libel "is written defamation"). "When the communication concerns untrue allegations of criminal behavior or unfitness to perform a job, the communication is libelous per se or slanderous per se." *Harstad*, 338 S.W.3d at 810. This simply

---

1. Judge Robert D. Sack is on the bench of the United States Court of Appeals for the Second Circuit and he is a lecturer on the faculty of Columbia Law School.

means "there is a conclusive presumption of both malice and damage." *Toler*, 458 S.W.3d at 282 (footnote omitted).

█ Fortney established her prima facie case for defamation by alleging that each of the appellees "falsely and maliciously published ... to [a co-defendant or third-party a] document ... which accused the Plaintiff of 'giving' a piano to Defendant Guzman that was the property of" JCPS. (Record, pp. 2–3). The defamatory language was an allegedly "[f]alse accusation of theft[.]"

█ But then came the appellees turn. They countered that the alleged defamatory statements were protected by a qualified privilege.[2] Unflattering language made within the scope of the employment relationship—and particularly "[i]n matters involving communications between employees in the chain of command[,]" *Landrum v. Braun*, 978 S.W.2d 756, 757 (Ky.App.1998)—are qualifiedly privileged, and "no recovery [for defamation] can be had." *Baskett v. Crossfield*, 190 Ky. 751, 228 S.W. 673, 675 (1920). The circuit court in this case found that the statement sued upon was made in the course and furtherance of an official investigation into the handling of school property. On that basis, the circuit court held the statement was protected by qualified privilege. Fortney does not challenge this finding.

█ What, then, is the impact of the qualified privilege on plaintiff's claim of defamation per se? *Toler* answered this question.[3]

█ When a qualified privilege is established, the prima facie presumption of malice disappears. *Toler*, 458 S.W.3d at 283 (the qualified privilege negates the presumption of malice). Stated another way, flowing from the qualified privilege is the presumption of the *absence* of malice. It then falls upon the plaintiff to defeat the privilege. *Toler*, 458 S.W.3d at 283 ("The qualified privilege is just that: qualified. [It is n]ot an absolute defense[.]"). The legal effect of the qualified privilege is not merely to put the parties on an even footing. If that were so, Fortney would be correct that "[w]hat this case boils down to ... is either Fortney, on the one hand, or Guzman and Light, on the other hand, is or are lying." (Appellant's brief, p. 18). But Fortney is wrong.

█ A qualified privilege can be lost if abused or exceeded. *Toler*, 458 S.W.3d at 283–84; *Baker v. Clark*, 186 Ky. 816, 218 S.W. 280, 285 (1920) ("That a defendant would lose his right of qualified privilege if he acted maliciously or in excess of the privilege, or with knowledge of the falsity of the communication, is well settled."). To overcome the qualified privilege, the plaintiff must affirmatively show both actual malice and falsity. *Toler*, 458 S.W.3d at 287.

█ Whether a qualified privilege has been abused or waived is a question of fact. *Columbia Sussex Corp., Inc. v. Hay*, 627 S.W.2d 270, 276 (Ky.App.1981). However, if the plaintiff fails to adduce such evidence sufficient to create a genuine is-

---

**2.** "Privileged communications ... are of two kinds; one being an absolute privilege, and the other only a qualified one." *Baker v. Clark*, 186 Ky. 816, 218 S.W. 280, 285 (1920). "A claim of defamation may be defeated by establishing the truth of the matter asserted which is an absolute defense." *Smith v. Martin*, 331 S.W.3d 637, 640 (Ky.App.2011). The

circuit court's decision turned on the qualified, not absolute, privilege. We focus our remarks accordingly.

**3.** Whether the appellees' evidence was sufficient to establish the existence of qualified privilege is a matter of law. *Toler*, 458 S.W.3d at 283, n. 15.

sue of fact, qualified privilege remains purely a question of law under the summary judgment standard. *Harstad,* 338 S.W.3d at 811.

This was the posture of Fortney's case at the moment the circuit court granted summary judgment. The dispute on appeal is over the measure of Fortney's evidentiary burden. The circuit court and the appellees take the position that Fortney failed to come forward with evidence of abuse and that she only reiterated the allegations in her complaint that the appellees uttered false and defamatory statements about her. Fortney claims she met her burden of production with the "she said-they said" argument referenced in a previous paragraph. That is, her mere assertion of falsity is indicative of malice and sufficient to defeat the privilege or, at the very least, to create a genuine issue of fact to survive summary judgment. *Chipman,* 38 S.W.3d at 390 (party opposing summary judgment must present affirmative evidence establishing a genuine issue of material fact to defeat summary judgment).

Fortney appears to believe that the burden of overcoming a qualified privilege does not require extrinsic evidence of malice. She leans heavily on the passage in *Stringer* that "[m]alice can be inferred from the fact of ... falsity." *Stringer,* 151 S.W.3d at 799 (footnote omitted). "Our law has long permitted an inference of malice from the mere falsity of the alleged defamatory statements." *Toler,* 458 S.W.3d at 286. But it does so no more. *Toler* explains:

> We can acknowledge that this notion of inferring malice was prevalent in the initial development of our defamation law; but the concept seems outdated in light of the law's departure from, practically speaking, strict liability and the burden of proof now associated with not

only the qualified privilege, but defamation in general. To the extent that *Stringer* stands for a perpetuation of allowing the mere allegation of falsity to permit an inference of malice, it is overruled. Within its scope, the qualified privilege permits defamatory statements. After all, *defame* means "to make a *false* statement about someone to a third person in such a way as to harm the reputation of the person spoken of." As a result, any statement in *Stringer* to the contrary notwithstanding, both malice *and* falsity must be shown for a plaintiff to overcome the qualified privilege.

*Id.* at 287 (footnotes omitted).

Fortney's proof that the appellees fabricated the sued-upon language consisted solely "of the testimony of the Plaintiff Fortney, herself, that she did not give the piano to Guzman[.]" (Appellant's brief, pp. 15–16). She claims this was competent evidence to support the falsity of the statement. (*Id.,* p. 18). If we were to agree to that much of Fortney's argument, she will have done nothing more than create a genuine issue as to the falsity of the alleged defamatory statements. This is insufficient to overcome the qualified privilege. She "was required to do more than assert that these statements were false; people are sometimes wrong without even suspecting it." *Harstad,* 338 S.W.3d at 813. And, "not every erroneous statement is expressed with malice." *Id.* As in *Toler,* even if we assume Fortney proved the falsity of the statements, she failed to prove any degree of malice. 458 S.W.3d at 287 ("[B]oth malice *and* falsity must be shown for a plaintiff to overcome the qualified privilege.").

In this case, Kemp, Guzman, and Light, upon inquiry, told school authorities what they perceived, overheard, or knew. These perceptions were not without foun-

dation or corroboration. Other appellees, such as Pendleton and Warman, marshaled the evidence produced by the investigation and submitted an internal investigatory report to appropriate school officials. None of the appellees received any evidence suggesting any of their statements were false or which would cause doubt as to the validity of the statements. Fortney has identified nothing to contradict the appellees' claims that each acted appropriately under the circumstances, with actual knowledge or after a reasonable investigation.

*Toler* makes quite clear that the qualified privilege may exist even if it can be proved that the statement at issue is false. *See* 458 S.W.3d at 283. "[W]hen a qualified privilege is established, [even] false and defamatory statements will not give rise to a cause of action unless maliciously uttered." 50 Am.Jur.2d *Libel and Slander* § 258 (2015). Fortney has identified no facts which would cause a reasonable person to believe that the appellees acted with malice. Having failed to sustain her burden of production, summary judgment in favor of the appellees was proper.

In light of the above analysis, we find Fortney's remaining assertions of error to be moot or without merit.

## IV. *Conclusion*

The Jefferson Circuit Court's January 14, 2013 Opinion and Order is affirmed.

ALL CONCUR.