RENDERED: APRIL 15, 2022; 10:00 A.M.
TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2020-CA-1265-MR

BROWN & BROWN OF
KENTUCKY, INC.                                          APPELLANT


APPEAL FROM JEFFERSON CIRCUIT COURT
v.        HONORABLE ANGELA MCCORMICK BISIG, JUDGE
ACTION NO. 17-CI-004440


DAVID C. WALKER AND
CBI HOLDINGS LLC                                        APPELLEES

AND

NO. 2020-CA-1322-MR


DAVID C. WALKER AND
CBI HOLDINGS LLC                  APPELLANTS/CROSS-APPELLEES


CROSS-APPEAL FROM JEFFERSON CIRCUIT COURT
v.        HONORABLE ANGELA MCCORMICK BISIG, JUDGE
ACTION NO. 17-CI-004440


BROWN & BROWN OF
KENTUCKY, INC.                    APPELLEE/CROSS-APPELLANT

AFFIRMING IN PART, REVERSING IN PART, AND
REMANDING APPEAL NO. 2020-CA-1265-MR AND
CROSS-APPEAL NO. 2020-CA-1322-MR

** ** ** ** **

BEFORE: COMBS, DIXON, AND TAYLOR, JUDGES.

TAYLOR, JUDGE: Brown & Brown of Kentucky, Inc. (Brown) brings Appeal

No. 2020-CA-1265-MR and David Walker and CBI Holdings LLC (CBI) bring

Cross-Appeal No. 2020-CA-1322-MR from Findings of Fact, Conclusions of Law,

and Judgment of the Jefferson Circuit Court. We affirm in part, reverse in part,

and remand Appeal No. 2020-CA-1265-MR and Cross-Appeal No. 2020-CA-

1322-MR.

These appeals primarily revolve around an Employment Agreement

entered between Brown and Walker.[1] Brown provides insurance and risk

management services and purchased Walker's business (Associated Insurance

Company) by execution of Asset Purchase Agreement and Goodwill Purchase

Agreement in January 2011. Concomitantly therewith, Walker and Brown

executed the Employment Agreement, and Walker was hired as Executive Vice

President and Profit Center Leader for Brown in Louisville, Kentucky. The

Employment Agreement's effective date was January 1, 2011, and contained a

---

[1] The underlying facts of this case are complicated. We will recite only those facts necessary for disposition of these appeals.

broad noncompete and nonsolicitation restrictive covenant. While still employed by Brown, Walker formed CBI in late 2015. Walker eventually left Brown's employment on March 31, 2017, and then exclusively worked at CBI selling insurance products.

Shortly thereafter, on August 23, 2017, Brown filed a complaint and, on October 29, 2018, filed an amended complaint in Jefferson Circuit Court against Walker and CBI. Therein, Brown alleged, in relevant part:

> 12. CBI is a direct competitor of Brown. CBI purports to be in the business of providing insurance and other risk management services in Kentucky and the surrounding area. . . .
>
> 13. Walker is an officer, member, and the manager of CBI, and has served in those capacities since at least January 19, 2016, as reflected in corporation filings with the Kentucky and Florida Secretary of State Offices (collectively attached as Exhibit B, 1-4). saIn [sic] these filings, Walker is described as "Manager," i.e., the person who has authority to manage, and Walker even signed his name as an "officer or chairman of the board" in one such filing.
>
> . . . .
>
> 20. . . . Walker's Employment Agreement also contains critical non-solicitation covenants (the "Non-Solicitation Covenants"). The Non-Solicitation Covenants prohibit Walker from "directly or indirectly, in any capacity whatsoever other than on behalf of [Brown], **solicit[ing]**, **accept[ing]**, **tak[ing] away**, propos[ing], quot[ing], sell[ing], plac[ing], provid[ing], **servic[ing]**, renew[ing] **or divert[ing]** any Client Account [as defined below] . . . or any Prospective Client

Account [as defined below]" that Walker worked on or had any involvement with during his employment with Brown. The Non-Solicitation Covenants also prohibit Walker from "tak[ing] any action . . . which reasonably may be expected to . . . cause any Client Account or Prospective Client Account . . . or other person or entity . . . to cease, reduce or refrain from transacting business with [Brown] or its Affiliates."

. . . .

27.     The Employment Agreement expressly provided that the Confidentiality Covenants and Non-Solicitation Covenants survive the termination of Walker's employment with Brown (regardless of why his employment was terminated). Specifically, the Confidentiality Covenants continue indefinitely. Moreover, the Non-Solicitation Covenants continue for two years after Walker's employment with Brown ended, in addition to any time in which Walker was breaching such Non-Solicitation Covenants.

. . . .

32.     On October 22, 2016, Walker notified Brown that he planned to resign from his employment with Brown effective December 31, 2016, in order to pursue other, [noninsurance] related, business ventures. During a subsequent conversation with new Profit Center Leader Michael T. Neal, Walker was informed that bonus eligibility required that he remain employed through the payment date, sometime in early 2017. Accordingly, Walker delayed his departure to March 31, 2017.

33.     Unbeknowst [sic] to Brown at that time, and long before Walker had notified Brown that he planned to resign to pursue other ventures, Walker had begun taking steps to compete against Brown and otherwise violate various obligations under the Asset Purchase Agreement, Goodwill Purchase Agreement, Employment

Agreement and his other duties under the law. Specifically, in late 2015, Walker engaged legal counsel for CBI, formed CBI, had an operating agreement prepared for CBI, designed and purchased marketing materials for CBI, sought insurance regarding CBI, reserved website domain names for CBI, arranged to acquire business and agency software for CBI, obtained a Tax ID, and opened a business bank account for CBI. By January 2016, Walker had capitalized CBI and was serving as its managing agent.

. . . .

46.     At the time Walker resigned from his employment with Brown, Quantum Enterprises, Inc.[,] was a client of Brown. Walker knew this fact at all times relevant to the Complaint. Walker continued communicating with Quantum Enterprises, accepting business from it, engaging in client service activities for it, and otherwise violating his respective Agreements with respect to Quantum Enterprises, after Walker's employment with Brown ended.

47.     Walker regularly worked with, helped Brown service, and otherwise was involved with Quantum Enterprises during his employment with Brown. CBI knew or had reason to know at all times relevant to the Complaint that Walker engaged in this conduct.

48.     After Walker misappropriated certain Confidential Trade Secrets concerning Quantum Enterprises and Walker subsequently resigned from his employment with Brown, Quantum Enterprises stopped using Brown's services for its insurance business. Rather, effective July 11, 2017, or before, Quantum Enterprises changed its agent of record to CBI for the insurance and insurance services that Brown previously had provided (Certificate of Insurance, attached as Exhibit C).

. . . .

51.     CBI and Walker have serviced Quantum Enterprises since it stopped using Brown's services.  CBI knew or had reason to know that Walker engaged in this conduct, and intended to cause Walker to engage in this conduct.

Amended Complaint at 3-4, 6, 9, 11, 15.  Brown also similarly alleged that Walker and/or CBI breached the restrictive covenant in the Employment Agreement by providing insurance services to other former Brown clients – East Wolcott Winona, McMillen Mechanical, Wilhite Limited, Inc., Steve Rauch, Banta Consulting, LOUCASH – 502 Bar Bistro, Moon Leasing/Moon Portables, Stanley Brothers Produce, Backyard Properties, Stuart Real Estate, and Home Staging Specialists.  In the complaints, Brown also alleged CBI tortiously interfered with Walker's performance of the Employment Agreement:

<u>COUNT VI:  TORTIOUS INTERFERENCE<br>WITH CONTRACT BY DEFENDANTS – DAMAGES</u>

. . . .

148.   By engaging in the conduct described above in Parts III.D to III.F, CBI tortiously interfered with Walker's Agreements with Brown.

149.   Defendants' actions described above have caused Brown to sustain damages including, but not limited to, lost income, lost client relationships and future lost client relationships, lost or diminished competitive advantages, and injury to its goodwill and reputation.

150. Accordingly, Brown is entitled to relief including, but not limited to, the damages and disgorgement remedies described in the Prayer for Relief below.

Amended Complaint at 29.

Walker and CBI filed an answer and counterclaim. In the answer, Walker admitted that he was an officer of CBI, and CBI admitted that it provided insurance and risk management services in Kentucky. However, Walker and CBI generally denied the remaining allegations. In the counterclaim, Walker claimed that Brown initially breached the Employment Agreement by refusing to timely pay him a bonus. As a result, Walker could not resign as planned on January 1, 2017, but was required to remain employed by Brown until March 31, 2017. Walker also asserted that the Employment Agreement did not prevent him from servicing former Brown clients who left Brown due to poor customer service issues. Walker further maintained that Brown was unjustly enriched by Walker's assistance to Brown after leaving its employment.

Eventually, Brown filed a motion for partial summary judgment. Relevant herein, Brown maintained that based upon undisputed facts, Walker breached the restrictive covenant in the Employment Agreement by providing services to Brown's clients while employed by Brown and after leaving Brown during his employment with CBI:

CBI is a Kentucky limited liability company with its principal place of business in Louisville. Answer ¶ 5. Like Brown & Brown, CBI is in the business of providing a full array of insurance brokerage services. *Id.* ¶ 12; *see also* FBT 000001-000035 (attached as Exhibit 5) (CBI Operating Agreement at FBT 000001: the purpose of CBI "is to own and operate an insurance consulting and brokerage firm based in Kentucky, and to engage in all business activities related thereto."); Walker [Deposition], 17:22-18:23; 101:10-102:4. In March 2015, while still a Brown & Brown Executive Vice President and leader of its Louisville Profit Center, Walker incorporated CBI. Ex. 5; *see also* Ex. 3, Answer to Interrog. 8 ("Walker states that CBI" was "created . . . in early 2015."); Walker Dep., 95:17-20,108:25-109:4. Upon CBI's incorporation, Walker became CBI's managing member, which position he continues to hold today. . . .

Prior to his departure from Brown & Brown, Walker took steps to render CBI operational and ready to compete with Brown & Brown, including:

• as early as 2015 ordering a "CBI Insurance" logo, setting up CBI bank accounts, and obtaining computer systems for CBI. *See, e.g.*, DW049232-240; DW049245-249; DW049255-263 (collectively, attached as Exhibit 6);
• obtaining errors and omissions coverage for CBI with a certificate of insurance dated January 31, 2017, to insure CBI had coverage effective March 1, 2017, at which time CBI was planning to begin binding clients as their broker in place of Brown & Brown. Walker Dep., 168:13-169:10;
• setting up a network and phone system at CBI in January and February 2017. *Id.*, 143:6-19;
• signing up insurance carriers for CBI to be able to place business with. *Id.*, 139:14-143:19, 148:2-149:13;

-8-

• asking customers to come to Brown & Brown's office so that Walker and the customers could confer on insurance that CBI, not Brown & Brown, might provide for those customers. *Id.*, 152:2-153:20; and

• engaging with other carriers, including Berkley, Nationwide, and KEMI. *Id.*, 154:24-157:20.

Walker admits that as of January 2017, CBI was operating as an insurance broker and that he produced insurance for both Brown & Brown and CBI at the same time in 2017, sometimes working for both CBI and Brown & Brown on the same accounts. *Id.* . . .

. . . .

[Walker] successfully established an insurance business in competition with Brown & Brown that got its start with his solicitation and service of Brown & Brown['s] existing and prospective customers with whom he was involved. At his deposition, Walker admitted he and CBI have accepted and serviced at least the following 17 Brown & Brown customers even though he remains in the midst of the two-year prohibition on soliciting and servicing Brown & Brown customers[.] . . .

By Brown & Brown's count, including additional customers taken by Walker since Walker was deposed, Walker and CBI have wrongfully poached 52 Brown & Brown customers, to date.

Brown's Motion for Partial Summary Judgment at 6-7, 9-10.

Likewise, on September 20, 2018, Walker and CBI filed a motion for summary judgment. Walker admitted to forming CBI while employed by Brown and to providing insurance services to Brown's prior clients; however, Walker and

CBI argued that Walker did not breach the restrictive covenant in the Employment

Agreement with Brown. In pertinent part, Walker and CBI maintained:

> The claims against David Walker can be divided into essentially two groups: (1) claims that he unlawfully operating [sic] a competing insurance company before leaving Brown & Brown on March 31, 2017; (2) claims that he unlawfully solicited or serviced Brown & Brown clients after leaving Brown & Brown. Defendants are entitled to summary judgment on all claims.

> . . . .

> Prior to January 1, 2017, David Walker did not commit any unlawful conduct and caused no injury to Brown & Brown. The actions he took to set up CBI – such as filing the corporate name, opening a bank account, buying computers and software, getting business cards – are not unlawful preparations to compete. Further, they are not injurious and did not injure Brown & Brown in any way. These are the types of harmless activities that the law finds unobjectionable.

> Thus, the Court should, at minimum, grant David Walker summary judgment on all claims regarding pre-January 1, 2017[,] preparations to operate CBI.

> During his last three months with Brown & Brown, David Walker's actions also were not unlawful and did not cause Brown & Brown any injury. . . .

> David began operating CBI as he had appropriately planned to do before Brown & Brown forced him to stay beyond his resignation date. He obtained relationships with insurance companies so that, when the time came, CBI would be able to sell insurance – an action which causes no injury to Brown & Brown. Further, he began assisting certain clients on a limited basis, when those clients needed assistance and had already made an

independent determination to leave Brown & Brown and work with another agency, regardless of whether David Walker could continue to service them. (Exh. 24, Aff. Banta; Exh. 33, Aff. Matheny.)

None of these actions caused damage to Brown & Brown. In fact, Brown & Brown's expert did not even calculate any lost profits allegedly suffered before March 31. Hypothetically, if there were any damages resulting from CBI's activities in that time frame, it would be a nominal amount because of the minimal business activity of CBI at that time. (Exh. 7, Depo. J. Bone, p. 37-38.)

Thus, the Court should grant David Walker summary judgment on all claims regarding his preparations to operate CBI from January 1, 2017[,] through March 31, 2017.

Plaintiff alleges that David Walker breached his nonsolicitation agreement by "taking" clients from Brown & Brown after termination of his employment. A breach of contract claim requires proof of three things: 1) existence of a contract; 2) breach of that contract; and 3) damages flowing from the breach of contract. *Metro Louisville/Jefferson Cty. Gov't v. Abma*, 326 S.W.3d 1, 8 (Ky. App. 2009). This breach of contract claim fails for multiple reasons.

First, there is no genuine issue of material fact that the Defendants caused Brown & Brown to lose any clients. The evidence of record demonstrates that Brown & Brown lost all clients at issue for reasons not caused by David Walker. This means that Brown & Brown cannot establish damage causation as a matter of law.

Brown & Brown's expert compiled a list of clients that Brown & Brown has purportedly lost to David Walker due to alleged breaches of his nonsolicitation agreement. (See Exhibit 36, BBKY expert tables.) However, the expert acknowledged that the list is based

on an assumption that these clients were lost as a result of David Walker's alleged breaches of contract. (Exh. 7, Depo. Bone, 91-92.) If they were not, then Brown & Brown has no claim. (*Id.*)

The record evidence [sic] demonstrates that Brown & Brown cannot prove David Walker caused Brown & Brown to lose clients. First, Brown & Brown simply has no evidence to meet its burden of proof that any clients left Brown & Brown due to unlawful conduct of David Walker. Moreover, most of the clients at issue have affirmatively stated that they left due to reasons caused by Brown & Brown, not David Walker. (See Exhs. 19-34.) In addition, with respect to "personal lines" insurance clients specifically, because David Walker was a **commercial lines** agent and did not service **personal lines** clients, the personal lines clients were not even within the scope of David Walker's nonsolicitation clause 8. Finally, with respect to a small number of clients on the list, Brown & Brown simply has a mistaken understanding that CBI has serviced them; CBI has not, and there is no record evidence to demonstrate otherwise. . . .

Brown and CBI's Motion for Summary Judgment at 12, 16-18 (footnotes omitted).

The circuit court rendered an Order Regarding Cross-Motions for Summary Judgment (summary judgment) on November 6, 2018. While denying both motions, the court narrowed the issues for trial. Based upon uncontroverted facts, the circuit court determined that Walker breached the restrictive covenant in the Employment Agreement by organizing CBI to directly compete with Brown, by engaging in insurance business for CBI while still employed by Brown, and by providing insurance products to former Brown clients after leaving Brown:

-12-

The Court finds that there is no genuine issue of material fact that Walker breached the terms of the Employment Agreement. Under the Agreement, Walker agreed that so long as he worked for Brown, he would "not undertake the planning or organizing of any business activity that is competitive with or that creates a conflict of interest with the work" he performed for Brown. Defendants' Motion, Ex. 2 § 1(b)[.] Yet it is undisputed that Walker organized CBI on March 2, 2015, and that the purpose of CBI "is to own and operate an insurance consulting and brokerage firm based in Kentucky, and to engage in all business activities related thereto." Plaintiff's Motion, Ex. 5 Arts. 1, 3.1. Moreover, Walker testified that CBI had become an insurance brokerage and intermediary as of January 2017 while Walker remained employed by Brown, and that CBI is a competitor of Brown. *Id.*, Ex. 1 at 97:21-98:8, 18:21-23[.] Accordingly, because Walker remained employed by Brown at the time he planned and organized CBI and when CBI became a functioning insurance brokerage and intermediary, he did so in breach of the terms of the Employment Agreement.

There is also no genuine issue of material fact that Walker breached the Employment Agreement by engaging in outside "Insurance Business" during his employment by Brown. The Employment Agreement provided that during Walker's employment, he would "not, directly or indirectly, engage in the Insurance Business . . . in any manner" except on behalf of or as directed by Brown. Defendants' Motion, Ex. 2 § 1(b). "Insurance Business" is defined under the Agreement to include "*quoting*, proposing, soliciting, selling, placing, providing, servicing, and/or renewing insurance or surety products or services." *Id.* at 1 (emphasis added)[.] Walker testified that he provided quotes to Banta and Semper Tek while he remained employed by Brown. Plaintiff's Motion, Ex. 1 at 119:13-20[.] This is sufficient to establish that Walker also breached this

-13-

provision of the Employment Agreement.

> The Employment Agreement further provided that for a period of two years following termination of Walker's employment, Walker also would not "directly or indirectly, in any capacity whatsoever other than on behalf of the Company, solicit, accept, take away, propose, quote, sell, place, provide, service, renew or divert any" clients or prospective clients that Walker had serviced or about which he learned confidential information while at Brown. Defendants' Motion, Ex. 2 § 5(b)(i). Again, Walker's testimony reveals that there is no genuine issue of material fact that he did not comply with this covenant. For example, Walker testified on January 31, 2018[,] that within the last few weeks he had taken away Brown accounts. Plaintiff's Motion, Ex. 1 at 191:19-24. He also testified that he was servicing clients at CBI that he had formerly serviced at Brown. *Id.* at 13:3-17:21. This conduct occurred within two years of Walker's departure from Brown at the end of March 2017, and thus was in breach of the terms of the Employment Agreement.

November 6, 2018, Order at 10-12 (footnotes omitted).

The circuit court ultimately tried the case over four days without a jury, beginning on November 13, 2018. The court rendered Findings of Fact, Conclusions of Law, and Judgment (judgment) on May 10, 2019. Kentucky Rules of Civil Procedure (CR) 52.01. Pertinent to these appeals, the circuit court decided that "[t]he evidence at trial did not alter the [c]ourt's conclusion on summary judgment that Walker breached the Employment Agreement." Judgment at 14. The circuit court reiterated that Walker breached the restrictive covenant in the Employment Agreement by organizing CBI while employed by Brown and by

-14-

servicing former Brown clients through CBI before and after leaving Brown. As to

damages for these breaches of the restrictive covenant, the circuit court

determined:

> In the present case, the Court does not find that Brown suffered damages as a result of Walker's organization of CBI before the end of his employment. Although that conduct violated the express terms of the Employment Agreement, no evidence was presented that it was, in and of itself, the proximate cause of any monetary damage to Brown.
>
> However, Walker's conduct in providing services to former Brown clients via CBI did, in some instances, result in recoverable damages to Brown. This includes profits lost by Brown as a result of Walker's servicing of former Brown clients Semper Tek and Banta Consulting before he left Brown's employment. In the Employment Agreement, Walker expressly agreed that during his employment he would not engage in insurance business on behalf of any person or entity other than Brown. PX 5 § 1(b). Yet Walker admitted at trial that he serviced Banta Consulting and Semper Tek via CBI while he remained employed by Brown and that he "probably shouldn't have taken these accounts." [Transcript] at 228:14-229:8, 232:3-15, 235:3-5. Given Walker's admission, Brown is entitled to recover the profits it lost and otherwise would have made from Banta Consulting (and its related company Erdco Properties) and Semper Tek but for Walker's conduct.
>
> The Court does not find that Brown should recover the alleged profits it lost from other commercial clients that have been serviced by Defendants since the termination of Walker's employment, however. Admittedly, Walker agreed that for a period of two years following the end of his employment with Brown, he

would not solicit, accept, take away, quote, sell, service, or renew Brown clients with whom he had been involved. PX 5 § 5(b)(i). Moreover, the evidence at trial established that Defendants have now serviced more than 60 former Brown clients in breach of this provision of the Employment Agreement. However, the Court also finds from the evidence presented at trial that Brown's loss of these clients was caused by the clients' independent decisions to terminate their business relationships with Brown due to poor customer service, rather than as a result of any solicitation by Defendants.

For example, John Austin, the owner and president of former Brown client Quantum Enterprises, testified at trial that he became frustrated with Brown after it provided only a single unsatisfactory quote for renewing Quantum's coverage. Tr. at 406:4-407:15. He further testified that Quantum also had difficulty reaching Brown and that Brown provided the renewal quote only a short time before Quantum's renewal deadline, impairing Quantum's ability to search for a better deal. *Id.* at 408:17-409:21. Notably, Mr. Austin also testified that he decided to terminate his business relationship with Brown independent of and before contacting Defendants, and that he would have left Brown even if his business had been moved somewhere other than CBI. *Id.* at 407:21-408:4.

Similarly, Jim Wilhite of former Brown client Wilhite Limited testified that his crane rental and machinery company faced a need for significantly increased coverage from $15 million to $30 million. *Id.* at 479:24-480:3. When Mr. Wilhite told Brown of the need for increased coverage, Brown responded that it did not know how to obtain such coverage. *Id.* at 480:4-18. Mr. Wilhite therefore did not trust that Brown could obtain the coverage required. *Id.* at 480:24-481:3. This was compounded by the unexplained issuance of a letter prematurely terminating Wilhite's coverage. *Id.* at 481:7-482:12. Mr. Wilhite therefore decided to move

-16-

Wilhite Limited's insurance business elsewhere, again independent of any solicitation by Defendants. *Id.* at 481:12-17, 482:9-12.

In yet another instance, the owner of former Brown client Impellizeri's Pizza testified that Brown failed to timely contact him to discuss renewal of the business's insurance coverage. *Id.* at 501:5-19. After contacting Brown, he was provided with a quote almost twenty percent higher than the previous coverage, and without adequate time to look for better coverage. *Id.* at 502:3-10. He therefore decided to move his business to another carrier and contacted Walker at CBI as well as another provider for quotes. *Id.* at 502:24-503:18. Similar credible testimony was received regarding former Brown clients Oak Island Creative, I-Gear, Advanced Production Systems, and KDR Services. *Id.* at 512:2-513:22, 520:11-527:7, 528:7-533:6.

The Court finds from the evidence presented at trial, including the testimony of these former Brown clients, that Brown had difficulty providing service to its commercial customers. These issues included Brown's failures to timely arrange coverage renewals, to procure required coverage, and to maintain sufficient familiarity with its customers' business and insurance needs. Moreover, the evidence at trial established that these issues were the cause of Brown's loss of its commercial clients to CBI, while no evidence was presented showing that Defendants actively solicited or otherwise caused these clients to leave Brown. Accordingly, because Walker did not cause commercial clients to leave Brown after the end of his employment, he is not responsible for the lost profits Brown sustained as a result of those departures even if his conduct was otherwise in breach of the Employment Agreement. . . .

However, the Court does find that Brown is entitled to recover the profits lost on its former personal lines clients serviced by Defendants in breach of the

-17-

Employment Agreement. As noted above, the Employment Agreement barred Walker from servicing former Brown clients with whom he had involvement. PX 5 § 5(b)(i). The testimony at trial established that Walker oversaw the Personal Lines department, and the Court therefore concludes that he had involvement with personal lines clients and could not service those clients after leaving Brown. Tr. at 428:20-24, 435:4-12, 702:12-703:10. Moreover, there is no evidence that Brown's loss of these clients was the result of anything other than Walker's breaches of the Employment Agreement. Further, with the exception of former Brown personal lines client John Austin, Walker also presented no admissible evidence at trial that Brown's loss of the personal lines clients was due to poor customer service or other issues. See Tr. at 405:8-418:24. Accordingly, the Court finds that Brown is entitled to recover the lost profits it would have received from its former personal lines clients other than John Austin but for Walker's breach of the Employment Agreement. . . .

Brown's expert John Bone offered three alternative scenarios for the calculation of Brown's lost profits. The Court finds that Mr. Bone's "Scenario 1," calculating lost profits over the two-year period of the restrictive covenants following the end of Walker's employment, is the appropriate measure of damages given that it accurately and with reasonable certainty reflects the profits that Brown would otherwise have received but for Walker's breach of the restrictive covenants. *See* PX 43 at 12-13; *Long* [*v. O'Bryan*, 91 S.W. 659, 660 (Ky. 1906)] (noting that the proper measure of damages is lost profits that would have been received "but for" the defendant's breach). Based on these calculations, Brown is entitled to recover $42,364.00 in lost profits proximately caused by Walker's servicing of Brown clients Semper Tek, Banta Consulting, and Erdco via CBI before the end of his employment, as well as $46,410.00 in profits lost from Brown's personal lines clients, for a total of $88,774.00.

-18-

May 10, 2019, Judgment at 15-19 (footnote omitted).  Concerning Brown's claim

of tortious inference with contract against CBI, the circuit court concluded that

Brown failed to present evidence that CBI improperly interfered with the

Employment Agreement:

> Brown did not present any evidence at trial that CBI improperly interfered with the Employment Agreement other than Walker's breaches of the Employment Agreement via his operation of CBI. However, to allow the imposition of liability for tortious interference with contract based solely upon a breach of the contract would amount to an improper recovery of punitive damages on a breach of contract claim.  *See Francis v. Armstrong Coal Reserves, Inc.*, No. 4:11-CV-00077, 2012 WL 777271, at *7 (W.D. Ky. Mar. 7, 2012) ("[I]f Plaintiff were permitted to demonstrate improper interference by a breach alone, it would effectively grant him access to punitive damages for a breach of contract. This would contravene the intent of the Kentucky legislature in enacting K.R.S. § 411.184(4).").  Thus, because the only evidence of improper interference is Walker's breaches of the Employment Agreement, Brown is not entitled to judgment on its claim for tortious interference with contract[.]

May 10, 2019, Judgment at 22-23.  The circuit court also refused to grant Brown

permanent injunctive relief.  Analyzing the issue under CR 65, the circuit court

believed:

> In the present case, Brown does not need to show a substantial question on the merits because it has already prevailed on its claim for breach of contract.  However, to obtain a permanent injunction, Brown must show that it will suffer irreparable harm in the absence of such relief and that the equities weigh in its favor.

The Court finds that a permanent injunction is not warranted because Brown's damages are purely monetary and reasonably certain, and therefore not irreparable. Moreover, the balancing of the equities weighs significantly against injunctive relief. Admittedly, on the one hand injunctive relief would provide Brown the benefit of its bargain and remedy Walker's numerous breaches of the Employment Agreement. On the other hand, however, injunctive relief would also negatively affect third parties insofar as it would require CBI to cease servicing numerous customers who are not contractually bound to do business with Brown and who wish to do business with CBI. Such a result would be particularly inequitable given the evidence at trial that many of Brown's commercial clients left due to dissatisfaction with Brown's customer service rather than as a result of any misconduct by Walker. Finally, Brown is recovering the lost profits caused by Walker's breaches for the two-year period of the restrictive covenants. For these reasons, permanent injunctive relief is not warranted.

May 10, 2019, Judgment at 23-24 (citation omitted). The circuit court also found that Brown was entitled to reasonable attorney's fees under the Employment Agreement. As to Walker's counterclaim, the circuit court concluded that Walker was not entitled to relief upon any claims therein.

Both Brown and Walker subsequently filed motions for attorney's fees. By order entered September 9, 2020, the circuit court found that Brown was entitled to an award of $60,000 in attorney's fees and costs per the Employment Agreement, but Walker was not entitled to such an award.

-20-

Brown filed a notice of appeal (Appeal No. 2020-CA-1256-MR) and Walker filed a notice of cross-appeal (Cross-Appeal No. 2020-CA-1322-MR) from the May 10, 2019, judgment and the September 9, 2020, order.

Our review of the circuit court judgment is twofold. First, the circuit court's findings of fact are set aside only if clearly erroneous. A finding of fact is clearly erroneous if not supported by substantial evidence of a probative value. CR 52.01; *City of Monticello v. Rankin*, 521 S.W.2d 79, 80 (Ky. 1975). Second, issues of law are reviewed *de novo*. *Bishop v. Brock*, 610 S.W.3d 347, 350 (Ky. App. 2020). With the foregoing in mind, we shall initially address Appeal No. 2020-CA-1265-MR and then Cross-Appeal No. 2020-CA-1322-MR.

<u>APPEAL NO. 2020-CA-1265-MR</u>

A.  *Lost Profits – Commercial Clients*.

Brown contends the circuit court erred as a matter of law by failing to award lost-profit damages arising from Walker's improperly providing insurance services to Brown's former commercial clients within two years of Walker's cessation of employment with Brown. Brown points out that the circuit court found that Walker, through CBI, provided insurance services to over sixty of Brown's former commercial clients in violation of the restrictive covenant found in Section 5(b)(i) of the Employment Agreement. Although the circuit court concluded that Brown breached the restrictive covenant as to over sixty former

-21-

commercial clients, Brown argues that the circuit court erroneously limited lost-profit damages to only three of Brown's former commercial clients. Brown focuses its argument upon the circuit court's decision that Brown failed to demonstrate causation as to lost-profit damages in relation to these former commercial clients. In particular, Brown claims:

> Although the court found the post-employment covenants reasonable and enforceable, the Judgment rewrites the Employment Agreement only to prohibit solicitation by Walker. It eviscerates Walker's promise that for two years he would not "accept" or "service" clients he serviced while at Brown & Brown. The court justifies this outcome by observing that Brown & Brown did not offer at trial client testimony that they would have remained with Brown & Brown but for Walker's solicitation of them. But, the injury to Brown & Brown from Walker's acceptance and service of Brown & Brown clients must be considered in context of the parties' Employment Agreement. In that light, Brown & Brown had no obligation to introduce client testimony that Walker solicited them in order to establish breach and causation. Rather, Brown & Brown was obligated to demonstrate only that during the restricted period Walker, via CBI, accepted and serviced clients he serviced at Brown & Brown. This Brown & Brown did, as the court's Judgment reflects. Loss to Brown & Brown naturally flows from Walker's acceptance and service of Brown & Brown clients during the restricted period, acts he absolutely could not do regardless of who approached whom or the reason those clients opted to do business with Walker and CBI rather than Brown & Brown. The causation analysis is that straightforward.

Brown's Brief at 11-12 (citations omitted). For the reasons hereinafter set forth, we agree.

It is fundamental that a contract without ambiguity will be enforced according to its terms. *Ky. Shakespeare Festival v. Dunaway*, 490 S.W.3d 691, 694 (Ky. 2016). And, the terms are to be given their plain and ordinary meaning. *Id.* Our review is *de novo* as the issue is one of law. *Thomas v. Univ. Med. Center, Inc.*, 620 S.W.3d 576, 591 (Ky. 2020).

In this appeal, the restrictive covenant is set forth in Section 5(b)(i) of the Employment Agreement and reads as follows:

> (b) *Non-Solicitation Covenants*. For a period of two (2) years following the Termination Date (the "Restricted Period"):
>
> (i) Executive [Walker] shall not, directly or indirectly, in any capacity whatsoever other than on behalf of the Company, solicit, accept, take away, propose, quote, sell, place, provide, service, renew or divert any Client Account that Executive either had some involvement in proposing, quoting, selling, placing, providing, servicing or renewing any Insurance Business or about whom Executive received any Confidential Information, or any Prospective Client Account that Executive either had some involvement in proposing or quoting any Insurance Business or about whom Executive received any Confidential Information. For purposes of this Agreement, Executive acknowledges that informing Client Accounts or Prospective Client Accounts that Executive is or may be leaving Company prior to leaving employment of Company shall be deemed to constitute prohibited solicitation under this Agreement absent the Company's prior written consent. Executive recognizes and acknowledges that Client Accounts and Prospective Client Accounts are not confined to any geographic area. Therefore, Executive acknowledges that there is no geographic restriction that

> applies to the non-solicitation covenant contained in this **Section 5(b)(i)** and that the scope of this covenant is appropriately limited by the customer-based restriction.

Employment Agreement at 8. The above restrictive covenant is plain and unambiguous. Under its clear terms, Walker was prohibited from directly or indirectly accepting, quoting, selling, providing, or taking away any client Walker had involvement with or confidential information about for two years following his employment with Brown.

The circuit court found that Walker "breached the Employment Agreement when he accepted and serviced former Brown clients via CBI both before and after leaving Brown." May 10, 2019, Judgment at 14. The circuit court observed that the evidence "established that Walker's breaches now extend to more than 60 former Brown clients serviced by CBI." May 10, 2019, Judgment at 14. Even though the circuit court found that Walker breached the restrictive covenant by providing services to over sixty former Brown commercial clients, the circuit court limited Brown's damages to lost profits related to only three former Brown commercial clients because the court believed Brown failed to prove causation as to the other commercial clients. The circuit court found that the loss of the other commercial clients "was caused by the clients' independent decisions to terminate their business relationships with Brown due to poor customer service, rather than as a result of any solicitation" by Walker. May 10, 2019, Judgment at 16. We

believe the circuit court misread or misinterpreted the restrictive covenant in the Employment Agreement.

As previously set forth, the restrictive covenant not only prevented Walker from soliciting former Brown clients, but it also prohibited Walker from servicing, accepting, or selling insurance products to former Brown clients. Thus, in order to recover lost-profit damages, it is unnecessary for Brown to demonstrate that its former clients ended their relationship with Brown because of Walker's solicitation. Rather, Brown need only demonstrate that it incurred a loss of anticipated profits by Walker's servicing of Brown's former clients. *Pauline's Chicken Villa, Inc. v. KFC Corp.*, 701 S.W.2d 399, 401 (Ky. 1985);[2] *Roadway Express, Inc. v. Don Stohlman & Assocs., Inc.*, 436 S.W.2d 63, 65 (Ky. 1968). To do so, Brown must merely present evidence proving with reasonable certainty the amount of lost profits attributed to Brown's former clients that are now serviced by Walker. *See Pauline's Chicken Villa, Inc.*, 701 S.W.2d at 401; *Roadway Express, Inc.*, 436 S.W.2d at 65.

To summarize, we reverse the circuit court's decision that Brown failed to demonstrate causation and was not entitled to lost-profit damages as to some of Brown's former commercial clients. Considering the terms of the broad

---

[2] In *Pauline's Chicken Villa, Inc. v. KFC Corporation*, 701 S.W.2d 399, 401 (Ky. 1985), the Supreme Court recognized the reasonable certainty rule as set forth in RESTATEMENT (SECOND) OF CONTRACTS § 352 (1981).

restrictive covenant, Brown need only present evidence establishing with reasonable certainty the amount of lost profits attributed to Brown's former commercial clients, which were being serviced by Walker through CBI. Upon remand, the circuit court shall reconsider the issue of lost-profit damages in relation to the former commercial clients and determine whether Brown demonstrated the amount of such lost profits with reasonable certainty. If so, Brown is entitled to an award of lost-profit damages as to each of the sixty former commercial clients serviced by Walker, consistent with this Opinion in regards to the computation of lost profits as will be discussed.

B.    *Extension of Restrictive Covenant.*

Brown next argues that the circuit court committed error by failing to extend the period of time the restrictive covenant is in effect. Brown points out that the circuit court determined that Brown was not entitled to permanent injunctive relief, per CR 65, to restrain Walker from breaching the restrictive covenant. Nonetheless, Brown maintains that it did not seek permanent injunctive relief against Walker under CR 65; rather, it seeks to enforce Section 5(c)(iii) of the Employment Agreement. Brown states that Section 5(c)(iii) extends the time period the restrictive covenant is effective in the event of a breach of the covenant by Walker, and in such event, the restrictive covenant is extended for a period of time equal to the period of time Walker violated the restrictive covenant.

Consequently, Brown argues that it is entitled to permanent injunctive relief *in futuro* and equal to the period of time Walker violated the restrictive covenant.

Section 5(c)(iii) of the Employment Agreement reads:

> (iii)   Executive acknowledges that the purpose of this **Section 5** would be frustrated by measuring the period of restriction from the date of termination of employment where Executive failed to honor the Agreement until directed to do so by court order.  Therefore, should legal proceedings have to be brought by the Company and/or its Affiliates against Executive to enforce this Agreement, the period of restriction under this **Section 5** shall be deemed to be extended for a period equal to the period of violation by Executive.

Employment Agreement at 9.  The above terms of Section (5)(c)(iii) are clear and unambiguous.  Thereunder, in the event Brown was required to take legal action against Walker to enforce the Employment Agreement because of Walker's breach of the restrictive covenant, the restrictive covenant would be temporally extended for a time period equal to the period of time Walker violated the restrictive covenant.

When the terms of a contract are unambiguous, the court is generally bound to give effect to same.[3]  *EthiCare Advisors, Inc. v. Atkins*, 636 S.W.3d 147, 151 (Ky. App. 2021).  As the terms of Section 5(c)(iii) are unambiguous, the

---

[3] The validity of the Employment Agreement is not raised by the parties as an issue of error in either appeal.

restrictive covenant must be extended for a time period equal to the period of time Walker violated the covenant. Upon remand, the circuit court shall determine the precise length of time Walker breached the restrictive covenant and extend the effectiveness of the restrictive covenant for a time equal thereto. However, while Brown is entitled to extend the effective time period of the restrictive covenant per Section 5(c)(iii), it is not *a fortiori* entitled to permanent injunctive relief in order to enforce the extended restrictive covenant.

Injunctive relief is an extraordinary remedy and is addressed to the sound discretion of the circuit court. *Wedding v. Harmon*, 492 S.W.3d 150, 153 (Ky. App. 2016). An abuse of that discretion occurs only when the "decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Com. ex rel. Conway v. Thompson*, 300 S.W.3d 152, 162 (Ky. 2009).

In the May 10, 2019, judgment, the circuit court denied permanent injunctive relief because "Brown is recovering the lost profits caused by Walker's breaches for the two-year period of restrictive covenants." May 10, 2019, Judgment at 24. Thus, the circuit court believed that monetary damages adequately compensated Brown for Walker's breaches of the restrictive covenant, which originally expired on March 31, 2019.

As we have concluded that the restrictive covenant should be temporally extended by Section 5(c)(iii) of the Employment Agreement, it is

necessary to remand the issue of permanent injunctive relief to the circuit court.

The circuit court exercises discretion as to issuance of permanent injunctive relief

and shall reconsider whether a permanent injunction against Walker is appropriate

in view of the temporally extended restrictive covenant.

C.      *Intentional Interference with Performance of a Contract by a Third Party.*

Brown also argues that the circuit court erred by concluding that

Walker's breach of the restrictive covenant in the Employment Agreement could

not constitute improper interference by CBI with the performance of a contract.

Brown maintains that CBI, through its agent's (Walker's) actions, improperly

interfered with the Employment Agreement between Walker and Brown.  In

particular, Brown claims that "[b]y allowing Walker to accept and service his

[Brown] clients at CBI, CBI caused Walker's breach of his post-employment

obligation to [Brown]."  Brown's Brief at 22.  Therefore, Brown argues that

Walker's breaches of the restrictive covenant constitute improper interference by

CBI with Walker's performance of the restrictive covenant.

In Kentucky, the essential requirements to prove a claim of intentional

interference with a contract by a third party are found in the RESTATEMENT

(SECOND) OF TORTS § 766 (1979) and are as follows:

> One who intentionally and improperly interferes with the
> performance of a contract (except a contract to marry)
> between another and a third person by inducing or
> otherwise causing the third person not to perform the

-29-

contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.

Under the above, the tortfeasor must induce or cause a third party not to perform a contract between the third party and another. *Harstad v. Whiteman*, 338 S.W.3d 804, 814 (Ky. App. 2011). So, it is axiomatic that the tortfeasor cannot be a party to the contract. *Id.* Stated differently, the tortfeasor must be a stranger to the contract. *Brooks v. Patterson*, 29 S.W.2d 26, 29 (Ky. 1930); *see also* 44B AM. JUR. 2d *Interference* § 6 (2022).

Here, Brown is essentially arguing that CBI improperly interfered with Walker's performance of the restrictive covenant in the Employment Agreement by permitting Walker to breach the restrictive covenant in the Employment Agreement while employed at CBI. Nevertheless, it is undisputed that Walker originally organized CBI and served as its managing member. Additionally, Brown has failed to introduce any evidence as to CBI's improper interference apart from Walker's breaches of the restrictive covenants in the Employment Agreement. Considering these uncontroverted facts, we simply do not believe that CBI is a stranger to the Employment Agreement. Albeit for different reasons than those expressed by the circuit court, we conclude that Brown's claim against CBI for inference with the Employment Agreement must fail as a matter of law. *See Harstad*, 338 S.W.3d at 814.

-30-

D.      *Attorney's Fees and Costs.*

Brown further asserts that the circuit court's award of attorney's fees was inconsistent with the Employment Agreement.  Brown maintains that it sought an award of $918,720 in attorney's fees and costs, but the circuit court only awarded Brown $60,000 in contravention of the plain terms of Section 5(c)(ii) of the Employment Agreement.  Brown believes the circuit court improperly "linked the amount of [Brown's] fee award to the amount of damages the court awarded."  Brown's Brief at 23.  Rather, Brown contends that Section 5(c)(ii) of the Employment Agreement entitles it to an award of the full amount of incurred attorney's fees and costs.

Under the Employment Agreement, Section 5(c)(ii) provides that Brown "shall be entitled to . . . attorney's fees and costs" if Walker breaches the restrictive covenants therein.  Yet, in Kentucky, the Supreme Court has recognized that "[i]t should never be overlooked that any award of an attorney fee is subject to a determination of reasonableness by the trial court."  *Capitol Cadillac Olds, Inc. v. Roberts*, 813 S.W.2d 287, 293 (Ky. 1991).  In so doing, the circuit court "should require parties seeking attorney fees to demonstrate that the amount sought is not excessive and accurately reflects the reasonable value of bona fide legal expenses incurred."  *Id.*

In this case, the circuit court was empowered to determine the reasonableness of Brown's attorney's fees. And, considering our reversal upon the issues of lost-profit damages and the extension of the restrictive covenant, we, likewise, vacate the circuit court's award of attorney's fees as the reasonableness of such award may be affected by reversal upon said issues. Upon remand, the circuit court shall reconsider the amount of attorney's fees Brown is entitled to per Section 5(c)(ii) of the Employment Agreement. In so doing, the circuit court shall exercise its discretion and determine the reasonable value of legal expenses Brown incurred due to Walker's breaches of the restrictive covenant in the Employment Agreement.

## CROSS-APEAL NO. 2020-CA-1322-MR

A.      *Measure of Lost Profits – Commercial Clients.*

Walker initially contends that the circuit court erroneously awarded Brown lost-profit damages based upon gross revenues as to three commercial clients, rather than net revenues. Walker points out that the circuit court awarded Brown $42,364 in lost-profit damages relating to Semper Tek, Banta Consulting, and Erdco. In awarding lost profits as to the three commercial clients, Walker maintains that the circuit court "mistakenly used the gross *revenue* numbers from Exhibit 5.1," which is the expert report of John Bone. Walker's Brief at 35.

Instead, Walker asserts that the circuit court should have calculated lost profits based upon the loss of net revenues suffered by Brown.

It is beyond cavil that lost profits should be based upon net revenue and compensate for loss of expected business activity less expenses for same. *Koplin v. Faulkner*, 293 S.W.2d 467, 469 (Ky. 1956). It does appear that the circuit court improperly utilized the loss of gross revenues from Semper Tek, Banta Consulting, and Erdco in calculating the award of lost profits. This was error. We, thus, reverse the award of $42,364 in lost-profit damages relating to Semper Tek, Banta Consulting, and Erdco. Upon remand, the circuit court shall base the award of lost profits upon the loss of net revenue incurred by Brown for all commercial clients that the court may conclude Brown is entitled to recover consistent with this Opinion.

B.     *Lost Profits – Personal Line Clients.*

Walker further asserts that the circuit erred by "shifting the burden to Walker to disprove causation of damages with respect to personal lines clients." Walker's Brief at 36. Walker believes that the circuit court improperly awarded Brown $46,410 in lost-profit damages "based upon an absence of proof that Brown lost the clients due to poor customer service or other issues." Walker's Brief at 36. Walker essentially argues that as with the commercial clients, Brown's loss of the personal lines clients was because of Brown's customer service issues.

As hereinbefore determined, the restrictive covenant set forth in Section 5(b)(i) of the Employment Agreement prohibited Walker from servicing, accepting, or selling insurance products to former Brown clients. Consequently, it is unnecessary for Brown to demonstrate that its former clients ended their relationship with Brown due to Walker's solicitation in order to recover lost-profit damages. Rather, Brown need only demonstrate that it incurred loss of anticipated profits by Walker's servicing of Brown's former clients. *See Pauline's Chicken Villa, Inc.*, 701 S.W.2d at 401; *Roadway Express, Inc.*, 436 S.W.2d at 65. Consequently, we reject Walker's assertion of error on this issue.

C.    *Attorney's Fees and Costs.*

Walker also claims to be entitled to an award of attorney's fees and costs under the Asset Purchase Agreement. Walker points out that the parties executed the Asset Purchase Agreement contemporaneously with the Employment Agreement.[4] In the Asset Purchase Agreement, Walker alleges that Section 7.8 entitles him to an award of attorney's fees and costs as the prevailing party. According to Walker,

> Brown asserted claims for breach of the Purchase Agreements, which it ultimately withdrew on the first day of trial, after extensive discovery and briefing regarding the viability of the claims. As such, Walker prevailed with respect to Brown's claims for breach of

---

[4] The Asset Purchase Agreement concerned the sale of Walker's business (Associated Insurance Company) to Brown & Brown of Kentucky, Inc.

the Purchase Agreements, which entitled to [sic] him to recover under Section 7.8 of the APA [Asset Purchase Agreement], which states that the prevailing party in any way proceeding "to enforce the terms of any of the Purchase Agreements *shall* be entitled to an award of reasonable costs and expenses, including reasonable attorney's fees and costs, incurred in investigating and pursing such action, both at the trial and appellate levels."

Walker's Brief at 37 (citation omitted).

Section 7.8 of the Asset Purchase Agreement provides:

Attorneys' Fees and Costs. The prevailing Party in any Proceeding brought to enforce the terms of any of the Purchase Agreement shall be entitled to an award of reasonable costs and expenses, including reasonable attorneys' fees and costs, incurred in investigating and pursuing such action, both at the trial and appellate levels.

As set forth above, the term prevailing party should be given its plain and ordinary meaning. *See Dunaway*, 490 S.W.3d at 694. Thus, a prevailing party is one "who successfully prosecutes the action or successfully defends against it" or one "in whose favor the decision or verdict is rendered." *Prevailing party*, BLACK'S LAW DICTIONARY (6th ed. 1990).

The record indicates that Brown voluntarily withdrew its claims for breach of the Asset Purchase Agreement on the first day of trial. Additionally, it appears that Walker did not allege that Brown breached any provision of the Asset Purchase Agreement. Under the undisputed facts herein, we simply do not believe

that Walker qualifies as a prevailing party entitled to attorney's fees and costs under Section 7.8 of the Asset Purchase Agreement.

For the foregoing reasons, we affirm in part, reverse in part, and remand Appeal No. 2020-CA-1265-MR and Cross-Appeal No. 2020-CA-1322-MR for proceedings consistent with this Opinion.

ALL CONCUR.

| BRIEFS FOR APPELLANT/CROSS-APPELLEE: | BRIEFS FOR APPELLEES/CROSS-APPELLANTS: |
|---|---|
| John T. Shapiro, *pro hac vice* Chicago, Illinois | Michael C. Merrick Casey L. Hinkle Louisville, Kentucky |
| Brent R. Baughman Louisville, Kentucky | ORAL ARGUMENT FOR APPELLEES/CROSS-APPELLANTS: |
| ORAL ARGUMENT FOR APPELLANT/CROSS-APPELLEE: | |
| John T. Shapiro, *pro hac vice* Chicago, Illinois | Michael C. Merrick Louisville, Kentucky |